LAFLIN, PICK & HEER, P.A.
ATTORNEYS AT LAW
8500 Menaul Boulevard, Northeast
Suite B262
Albuquerque, New Mexico 87112
P.O. Box 3260
Albuquerque, New Mexico 87190

*Office Main*: 505-883-0679
*Facsimile:* 505-883-5834

JOHN E. HEER
*Direct Dial:* 505-872-1207
*Email:* jheer@laflin.com

July 12, 2018

Internal Revenue Service
Attention: Richard Sorrell
2864 South Circle Drive
Colorado Springs, Colorado 80906

Re: **CSI Aviation, Inc.**
**Taxpayer Identification Number:** Redacted
**For the Quarters Ended March 31, 2015 through September 30, 2017**

Dear Mr. Sorrell:

Receipt is acknowledged of your letters dated May 15, 2018 and June 5, 2018 (the 30 Day Letter), which enclosed copies of Form 5385, Excise Tax Examination Changes, and Form 886-A, Explanation of Items related to the Federal Excise Tax Examination of CSI Aviation, Inc. ("CSI") for the quarters stated above. We appreciate your agreement to extend the response date to July 13, 2018, and this letter is timely submitted.

Protest is hereby made of the proposed adjustments and all related imposition of Federal Excise Tax, penalties, and interest. In support thereof, the following is submitted:

A. **Request for Hearing:**

CSI hereby requests that this case be scheduled for an in-person conference with the Appeals Office.



EXHIBIT C

B. **Name and Address of Taxpayer:**

CSI Aviation, Inc.
3700 Rio Grande Boulevard NE
Albuquerque, New Mexico 87107

C. **Date and Symbol of Letter:**

May 15, 2018 (Corrected) - Letter 950E(DO)(6-2005) (copy attached)
June 5, 2018 - Letter 686(DO)(Rev. 7-2001) (copy attached)

D. **Tax Periods Involved:**

All quarters ending March 31, 2015 through September 30, 2017, including any such periods for which the Internal Revenue Service has made a "quick assessment" and may have issued a Notice CP220, whether or not Taxpayer has made a divisible payment and has filed or files herewith or subsequently a Form 843, Claim for Refund.

E. **Unagreed Paid Claim Considerations under IRM Section 4.24.16**

In order to engage the Appeals process with respect to periods for which the Internal Revenue Service has made a "quick assessment" and may have issued a Notice CP220, whether or not Taxpayer has yet made a divisible payment and filed a Form 843, Claim for Refund, the Taxpayer agrees to and will comply with the process set forth in Internal Revenue Manual §4.24.8.16. Concurrent with this letter Taxpayer is delivering to the Revenue Agent Forms 843 and a divisible portion payment for each quarter ending June 30, 2015 through December 31, 2016. No Form 843 is enclosed for the quarter ending March 31, 2015 since the Taxpayer has extended the statute of limitations for such quarter.

F. **Findings to Which the Taxpayer Takes Exception:**

The Taxpayer takes exception to the IRS's determination that IRC §4261(a) or 4261(b) Federal Excise Tax should be applied to domestic segments of uninterrupted international air transportation. This exception includes all tax, penalties and interest shown on Form 5385, Excise Tax Examination Changes "corrected version" dated 5/16/2108 (copy attached).

G. **Facts and Authorities Relied Upon:**

**FACTS:**

CSI is a diversified and experienced worldwide aviation services company based in Albuquerque, New Mexico. CSI provides domestic and international charter air transportation services to governmental and private customers. CSI arranges and contracts for charter air transportation on aircraft owned and operated by airlines and air transportation providers unrelated to CSI.

CSI was contracted with the United States Government to provide air transportation for agencies of the United States Government (herein "United States Government flights"), under a five contracts issued by the Compliance and Removals Division of the Immigration and Customs Enforcement Agency (ICE) under CSI's GSA Schedule contract GS-33F-0025V.

Pursuant to these contracts with the United States Government, CSI arranges unscheduled air charter flight services to provide mass air transportation of illegal aliens placed in ICE custody for the purpose of transporting such illegal aliens out of the United States. The destination of the flights, the time of the flights, the number of passengers and the number of intermediate stops, are unscheduled and are dictated solely by the United States Government. The itinerary, timing, and passenger list of the flights are dictated solely by the United States Government on an irregular basis which frequently changes on a last-minute basis depending on factors such as court hearings, the international destination to which the illegal aliens ultimately are being transported, health issues of a particular illegal alien, and the desire of the United States Government to maximize the number of passengers per flight. Each of these variables is completely outside the control of CSI and of the illegal aliens being transported. CSI is not even provided a copy of the final manifest of passengers.

Due to variables such as described above, illegal aliens being transported out of the United States may be stopped for final processing and aggregated at intermediate collection locations within the United States before departing for the ultimate international destination. None of the passengers, other than United States Government employees and CSI employees and subcontractors, have an ultimate destination other than a location outside the United States and the 225 mile zone (as defined in IRC §4262(c)(2)). Due to the decision of the United States Government to maximize the number of passengers on each international flight, illegal aliens being transported may disembark for an extended period at a holding location until a full plane load of illegal aliens is assembled at the holding location. This is a decision by ICE and is not within the control of either CSI or the illegal alien. ICE does not disclose to CSI the names of

the illegal aliens actually transported on any particular flight, and only the actual carrier knows the final flight manifest. ICE discloses no additional information to CSI regarding an illegal alien passenger, including the actual flight or layover itinerary traveled by any illegal alien being transported ultimately to an international destination.

**APPLICABLE LAW AND DISCUSSION:**

1. Technical Advisory Memorandum 9502004 confirms clearly the approach of the Airport and Airway Revenue Act of 1970 is to subject the use of aircraft to either the taxes on transportation of persons and freight or to the fuel taxes, but not to both as to any one trip. If an aircraft is being used for a passenger charter flight, the taxes imposed by IRC §4261 would be applicable and there would be no fuel tax imposed by IRC §4041(c) or, if applicable, IRC §4081(a)(2)(C). In addition to the IRC provisions which eliminate the possibility of double excise taxation of fuel, certain provisions apply to eliminate even single excise taxation of fuel in the event that fuel is utilized in providing air transportation which is not "taxable transportation" as defined in IRC §4262(a), because IRC §4261(b) imposes a tax only on "taxable transportation." Thus, if air transportation is part of uninterrupted international air transportation (as defined in IRC §4262(c)(3)) no excise tax is applicable under any of IRC §§4041(c), 4081(a)(2)(C), 4261(a), or 4261(b). In such event the only Federal Excise Tax applicable is that for the use of international travel facilities as imposed by IRC §4261(c) which CSI has calculated and paid.

2. The proposed assessment disregards factors which should be known to and determinative for the Revenue Agent. The relevant Federal Excise Tax statutes and regulations (implemented in the 1950s and 1960s) do not anticipate that there would be a time in the United States when a Department of Homeland Security would exist, that the activities engaged in by the Department of Homeland Security and ICE would be a necessary and constant part of life in the United States, and that for reasons of national security required for those operations and the logistical challenges of identifying illegal aliens and assuring their acceptance back in their home countries the United States Government itself would either not know or would withhold information which might be critical for a taxpayer to determine accurately its obligations and passenger manifests until immediately before a flight. Requiring application of regulations from the Ozzie and Harriet era to a post-9/11 world is unworkable. As stated before, ICE does not disclose to CSI the names of the illegal aliens actually transported on any particular flight, and only the actual carrier knows the final flight manifest. ICE does not disclose additional information to CSI regarding an illegal alien passenger, including the actual flight or layover itinerary traveled by any illegal alien being transported

ultimately to an international destination, so it is not even possible for CSI to apply the so-called 12 hour rule in connection with ICE flights. Because CSI does not have the required information from ICE, and thus cannot produce it, the Revenue Agent has proposed to assess the IRC §4261(a) Federal Excise Tax against every penny of revenue received by CSI for all flights beginning and ending in the United States, without any consideration that all or even any of these would be part on nontaxable "uninterrupted international air transportation". Apparently the Revenue Agent finds no irony in the situation that the United States Government would assess a tax because the Taxpayer could not produce records which the United States Government itself does not supply to the Taxpayer. Apparently the Revenue Agent also finds nothing wrong with intentionally misinterpreting the statute and regulation to focus on the aircraft rather than the passenger simply because the aircraft movements are known to CSI. The statutory impetus of the tax is the passenger movement, not the aircraft movement. To propose an assessment under these circumstances is arbitrary, capricious, and likely violate CSI's due process rights under the Fifth Amendment to the United States Constitution.

It is clear from IRC §4261(a)(2) the tax under §4261(a) and 4261(b) is not intended to be imposed on uninterrupted international air transportation. It is also clear from the terms of the ICE contracts issued under GS-33F-0025V that, whatever the actual itinerary, each passenger on flights conducted under that contract (other than crew and government agents) is an illegal alien bound as expeditiously as can be arranged by the United States Government for a final destination outside the United States and the 225 mile zone. Applying IRC §4261(a) and 4261(b) Federal Excise Tax concepts to the illegal alien passengers on these flights would be nothing short of utilizing the immigration and fair processing concerns of the United States Government to tax the United States Government itself in violation of both the spirit and intent of the Federal Excise Tax law. The proper response for the Internal Revenue Service would be to recognize the facts of illegal alien repatriation as a circumstance for thoughtful and reasonable application of Treasury Regulation §49.4262(c)-1(c)(2) such that if and whenever the time period of an illegal alien's intermediate stop in the United States is dictated by the United States Government as more than twelve hours (due to any reason outside the control of the illegal alien or CSI) the flight and the illegal alien's journey continues to be part of uninterrupted international air transportation. Treasury Regulation §49.4262(c)-1 was adopted in 1959 and amended most recently in 1962, both years being decades before the creation of ICE, and simply cannot be applied fairly and reasonably to the national security challenges faced by ICE on a daily basis in protection of American citizens from illegal alien threat. By its very mission all flights by "ICE Air" and all layovers

are unscheduled and all ICE flights for the process of removing illegal aliens are uninterrupted international air transportation. Application of an arbitrary standard such as the regulatory created 12 hour rule to this transportation is itself arbitrary and capricious. Treating ICE repatriation flights of illegal aliens in the same manner as a U.S. citizen's vacation flight to Belize for fishing and golf is nothing short of unthinking.

Utilizing fair and logical thinking, the performance of the ICE contracts issued under GS-33F-0025V does not produce "taxable transportation" subject to the Federal Excise Tax imposed under IRC §4261(a) or 4261(b).

"Taxable transportation" is defined under IRC §4262(a) to include, in relevant part, (i) transportation by air which begins in the United States or in the 225 mile zone and ends in the United States or in the 225 mile zone ("(a)(1) Test") and (ii) in the case of transportation by air other than transportation that satisfies the (a)(1) Test, that portion of such transportation that is directly or indirectly from one port or station in the United States to another port or station in the United States, but only if such portion is not part of "uninterrupted international air transportation" ("(a)(2) Test").

"Uninterrupted international air transportation" is defined under IRC §§ 4262(c)(3)(A) and (B) to include (i) air transportation that does not meet the (a)(1) Test and (ii) air transportation with respect to which the scheduled interval (emphasis added) between the United States leg of the trip and the balance of the trip is not more than twelve hours. Where there are two or more United States legs, the air transportation is considered uninterrupted international air transportation if the scheduled interval (emphasis added) between any two United States legs does not exceed twelve hours.

The United States Government flights are not taxable transportation under either the (a)(1) Test or the (a)(2) Test and therefore are not subject to the Federal Excise Tax imposed under IRC §4261.

***(a)(1) Test***

In order to be taxable transportation under the (a)(1) Test, the transportation must begin and end in the United States or in the 225 mile zone. Although the Code and the regulations do not provide a specific test for determining when a stopover at an intermediate point causes one transportation to end and a new transportation to begin (thereby resulting in two transportations), Treasury Regulation §49.4261-5(b) provides appropriate guidance.

Under Treasury Regulation §49.4261-5(b), a payment "for transportation between two or more points in the United States is a payment for transportation which begins and ends in the United States, even though additional transportation to or from a point outside the United States is involved in the entire journey, if at the time of making payment for the transportation between two or more points in the United States it is not definitely established…that such transportation is purchased for use in making the journey from or to a point outside the United States" (emphasis added). Conversely, then, if at the time of making payment for the transportation it is definitely established …that such transportation is purchased for use in making the journey from or to a point outside the United States, under the rationale of Treasury Regulation §49.4261-5(b), the United States Government flights are not transportation which begins and ends in the United States. Although there may be an intermediate stop in the United States before arriving at the journey's ultimate destination outside the United States, at the time of making payment for the transportation it is definitely established that the transportation is purchased for the purpose of transporting illegal aliens to points outside the United States. Therefore, a stop at a location in the United States during the course of a journey where the ultimate destination is to a location outside the United States does not make the trip a transportation that begins and ends in the United States. Instead, the determination of whether transportation begins and ends in the United States is made by looking at the entire journey and its ultimate destination. The focus is the passenger, not the aircraft. See, for example, Rev. Rul. 74-537 and Rev. Rul. 85-36.

With respect to the United States Government flights, it is unquestionably established that the purpose of the flights is to transport illegal aliens out of the United States. Each illegal alien's ultimate destination is the receiving nation, which in every case is outside the United States and outside the 225 mile zone. The stopovers are merely a necessary part of the unitary journey outside the United States and are dictated by the United States Government. The stopovers have no purpose other than as part of a unitary journey outside the United States. Accordingly, each stopover should be disregarded in determining whether the transportation begins and ends in the United States, and as a result, the entire journey is treated as one transportation purchased solely for use in making an illegal alien's journey from a point inside the United States to a point outside the United States. The flights are not transportation that begins and ends in the United States and are not taxable transportation under the (a)(1) Test.

***(a)(2) Test***

Under the (a)(2) Test, the transportation between one port or station in the United States to another port or station in the United States (i.e., the United States leg) of an international flight is taxable transportation unless the United States leg is part of uninterrupted international air transportation. As stated above, IRC §§4262(c)(3)(A) and (B) define uninterrupted international air transportation to include air transportation where the scheduled interval (emphasis added) between each United States leg of a trip is not more than twelve hours.

If an intermediate stop on a United States Government flight happens to be for more than twelve hours, the flight should still be considered part of uninterrupted international air transportation. Treasury Regulation §49.4262(c)-1(c)(2) provides that where a scheduled interval is increased to exceed twelve hours, the transportation will still be considered uninterrupted international air transportation if the increase in time is attributable to delays in the arrival or departure of the scheduled air transportation and if the passenger continues the transportation no later than on the first available flight offered by the continuing carrier that affords him substantially the same accommodations.[1] This regulation is designed to cover delays caused by issues which are beyond the control of the passengers being transported (such as delays due to maintenance, weather, governmental action to ground an aircraft, etc.). The Revenue Agent cites Rev. Rul. 64-6 as support, but fails to note the Revenue Ruling analyzes a fact pattern under which the passenger controls the itinerary and purchases the tickets. Neither factor is applicable to the ICE flights. Therefore, if the time period of any of the illegal alien's intermediate stops in the United States is increased by the United States Government to more than twelve hours or is due to some other reason outside the control of the illegal alien passenger or CSI, the flight should still be considered part of uninterrupted international air transportation and should not be taxable transportation under the (a)(2) Test. Any delay, regardless of length, is not to allow the illegal alien stop for a leisurely round of golf at a local country club of note, but rather to retain the illegal alien in detention until such time as the next available flight to the illegal alien's country of origin is available. At times these delays can be substantial because the Office of Inspector General criticizes the Department of Homeland Security if its charter aircraft are not packed to capacity. (See attached report OIG-15-57, April 9, 2015). If an illegal alien who is being transported on a United States Government flight remains at an intermediate stop for more than twelve hours at the direction of the United States Government due

[1] The regulation refers to a not more than six-hour stopover requirement. However, the regulation has not been amended since the enactment of the Tax Equity and Fiscal Responsibility Act of 1982 (P.L. 97-248), which increased the stopover requirement from six to twelve hours.

to restrictions by the receiving nation, cost considerations, or other circumstances outside of the control of CSI or the illegal alien being transported, the illegal alien's trip should still be part of uninterrupted international air transportation since the illegal alien continues on the journey to the receiving nation on the next United States Government controlled flight to the receiving nation which has available seats. Any application of the 12 hour rule to the ICE flights is contrary to the intent of the Treasury Regulations and is arbitrary.

With respect to the United States Government flights, the United States legs are not "regularly scheduled" because they are unpredictable in nature and are not determined by CSI or by the illegal aliens being transported. United States legs on the United States Government flights are dictated by the United States Government and are outside the control of CSI and the illegal aliens being transported. Since the stops are not part of a "scheduled interval" and are not "regularly scheduled" as such terms are used in IRC §4262(c)(3) and Treasury Regulation §49.4262(a)-1(a)(2), they should be disregarded in applying the (a)(2) Test. With disregarded stops, all of the United States Government flights would be uninterrupted international air transportation flights and would not be subject to the Federal Excise Tax under IRC §4261.

The United States Government flights do not fall within the (a)(1) Test because the flights are not transportation that begins and ends in the United States. The United States Government flights do not fall within the (a)(2) Test because the intermediate stops in the United States are part of uninterrupted international air transportation, or alternatively should be disregarded because they are not regularly scheduled. Therefore, the flights should not be taxable transportation under IRC §4262 and should not be subject to the Federal Excise Tax imposed under IRC §4261.

3. The Revenue Agent references CSI's proper filings related to fuel tax credits under IRC §4092 [sic] as "noteworthy" and providing support for the Revenue Agent's positions in Form 886-A. Sheepishly it seems, the Revenue Agent admits "the definition of international differs between IRC 4261 and 4092 [sic]". This definitional difference renders the Revenue Agent's argument spurious and to be disregarded by the Appeals Officer.

4. Res judicata principles apply here. A previous audit of CSI examined the same issue as is being examined again in this present audit. Upon Appeal the previous audit was finally resolved as a "no change" on this issue. A Closing Agreement should be considered to have been entered on this issue. After the resolution of the audit the IRS issued its closing letter (copy attached) with the IRS agreement

"Since there was no deficiency or overassessment, you do not need to take any further action." Since neither the facts nor the law has changed since the completion of the prior audit and appeal, there was no reason for CSI to calculate and file its excise tax return in any manner differently than before. In fact, to change after the previous "no-change" would *ipso facto* have been to file incorrectly. If the CSI filing method was "no-change" in 2010 through 2012, it remains "no-change" for 2015 through 2017 and to-date. Why would the IRS, in effect, run a "bait and switch" on CSI?

In summary, it is more than inconceivable that the IRS would apply an excise tax imposed by the United States Government in a manner to divert to the IRS funding which the United States Congress budgeted for ICE operations. For all the above reasons, the Taxpayer submits that the Revenue Agent erred in preparing Form 886-A and Form 5385, and in issuing CP220 assessment notices. Taxpayer protests the proposed adjustments and demands that the Taxpayer's returns for the tax years in question be accepted as filed. The taxpayer reserves the right to supplement this protest during the Appeal process.

Very truly yours,

LAFLIN, PICK & HEER, P.A.

By________________________
John E. Heer

## DECLARATION

Under penalties of perjury, I declare that I examined the facts stated in this protest, including any accompanying documents, and, to the best of my knowledge and belief, they are true, correct and complete.

Dated: July 12, 2018.

Allen E. Weh, President, CSI Aviation, Inc.

Form **843**
(Rev. August 2011)
Department of the Treasury
Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
**(b)** an abatement of FUTA tax or certain excise taxes, or
**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or
**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s)<br>CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.)<br>3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code<br>Albuquerque, NM 87107 | Employer identification number (EIN)<br>Redacted |
| Name and address shown on return if different from above | Daytime telephone number<br>505-761-9000 |
| **1 Period.** Prepare a separate Form 843 for each tax period or fee year.<br>From 04/01/2015 to 06/30/2015 | **2 Amount to be refunded or abated:**<br>$ 50.00 |

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.
☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.
☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☒ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | Print/Type preparer's name<br>John Howard, CPA | Preparer's signature<br>John Howard | Date<br>7/11/2018 | Check ☐ if self-employed | PTIN<br>P00038737 |
|---|---|---|---|---|---|
| | Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ | Redacted |
| | Firm's address ▶ 2155 Louisiana NE Ste7000, Albuquerque, NM 87110 | | | Phone no. | 505-200-3800 |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
5W8122 1.000

Form **843**
(Rev. August 2011)
Department of the Treasury
Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,

**(b)** an abatement of FUTA tax or certain excise taxes, or

**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),

**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or

**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s)<br>CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.)<br>3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code<br>Albuquerque, NM 87107 | Employer identification number (EIN)<br>Redacted |
| Name and address shown on return if different from above | Daytime telephone number<br>505-761-9000 |

**1 Period.** Prepare a separate Form 843 for each tax period or fee year.
From 07/01/2015 to 09/30/2015

**2 Amount to be refunded or abated:** $ 50.00

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.

☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.

☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☒ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | Print/Type preparer's name<br>John Howard, CPA | Preparer's signature<br>John Howard | Date<br>7/11/2018 | Check ☐ if self-employed | PTIN<br>P00038737 |
|---|---|---|---|---|---|
| | Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ Redacted | |
| | Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. 505-200-3800 | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.**

Form **843** (Rev. August 2011) Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,

**(b)** an abatement of FUTA tax or certain excise taxes, or

**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),

**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or

**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s)<br>CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.)<br>3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code<br>Albuquerque, NM 87107 | Employer identification number (EIN)<br>Redacted |
| Name and address shown on return if different from above | Daytime telephone number<br>505-761-9000 |

**1 Period.** Prepare a separate Form 843 for each tax period or fee year.
From 10/01/2015 to 12/31/2015

**2 Amount** to be refunded or abated: $ 50.00

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.

☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.

☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☒ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | Print/Type preparer's name<br>John Howard, CPA | Preparer's signature<br>John Howard | Date<br>7/11/2018 | Check ☐ if self-employed | PTIN<br>P00038737 |
|---|---|---|---|---|---|
| | Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ Redacted | |
| | Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. 505-200-3800 | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
5W8122 1.000

Form **843** (Rev. August 2011) Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
**(b)** an abatement of FUTA tax or certain excise taxes, or
**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or
**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s): CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.): 3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code: Albuquerque, NM 87107 | Employer identification number (EIN): Redacted |
| Name and address shown on return if different from above | Daytime telephone number: 505-761-9000 |

**1 Period.** Prepare a separate Form 843 for each tax period or fee year. From 01/01/2016 to 03/31/2016

**2 Amount to be refunded or abated:** $ 50.00

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.
☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.
☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☐ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| John Howard, PC | John Howard | 7/11/2018 | | P00038737 |
| Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ | Redacted |
| Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. | 505-200-3800 |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
6W8122 1.000

Form **843** (Rev. August 2011)
Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
**(b)** an abatement of FUTA tax or certain excise taxes, or
**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or
**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s): CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.): 3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code: Albuquerque, NM 87107 | Employer identification number (EIN): Redacted |
| Name and address shown on return if different from above | Daytime telephone number: 505-761-9000 |
| **1 Period.** Prepare a separate Form 843 for each tax period or fee year. From 04/01/2016 to 06/30/2016 | **2 Amount** to be refunded or abated: $ 50.00 |

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.
☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.
☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☐ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | | | | |
|---|---|---|---|---|
| Print/Type preparer's name: John Howard, CPA | Preparer's signature: John Howard | Date: 7/11/2018 | Check ☐ if self-employed | PTIN: P00038737 |
| Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ Redacted | |
| Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. 505-200-3800 | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
6W8122 1.000

Form **843** (Rev. August 2011)
Department of the Treasury
Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
**(b)** an abatement of FUTA tax or certain excise taxes, or
**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or
**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s)<br>CSI Aviation Inc. | Your social security number |
| Address (number, street, and room or suite no.)<br>3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code<br>Albuquerque, NM 87107 | Employer identification number (EIN)<br>Redacted |
| Name and address shown on return if different from above | Daytime telephone number<br>505-761-9000 |

**1 Period.** Prepare a separate Form 843 for each tax period or fee year.
From 07/01/2016 to 09/30/2016

**2 Amount to be refunded or abated:** $ 50.00

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.
☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.
☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☒ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | | | | |
|---|---|---|---|---|
| Print/Type preparer's name<br>John Howard, CPA | Preparer's signature<br>John Howard | Date<br>7/11/2018 | Check ☐ if self-employed | PTIN<br>P00038737 |
| Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ Redacted | |
| Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. 505-200-3800 | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
6W8122 1.000

Form **843** (Rev. August 2011)
Department of the Treasury Internal Revenue Service

# Claim for Refund and Request for Abatement

▶ See separate instructions.

OMB No. 1545-0024

Use Form 843 if your claim or request involves:

**(a)** a refund of one of the taxes (other than income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding) or a fee, shown on line 3,
**(b)** an abatement of FUTA tax or certain excise taxes, or
**(c)** a refund or abatement of interest, penalties, or additions to tax for one of the reasons shown on line 5a.

**Do not** use Form 843 if your claim or request involves:

**(a)** an overpayment of income taxes or an employer's claim for FICA tax, RRTA tax, or income tax withholding (use the appropriate amended tax return),
**(b)** a refund of excise taxes based on the nontaxable use or sale of fuels, or
**(c)** an overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.

| | |
|---|---|
| Name(s)<br>CSI Aviation, Inc. | Your social security number |
| Address (number, street, and room or suite no.)<br>3700 Rio Grande Blvd NW Ste 1 | Spouse's social security number |
| City or town, state, and ZIP code<br>Albuquerque, NM 87107 | Employer identification number (EIN)<br>Redacted |
| Name and address shown on return if different from above | Daytime telephone number<br>505-761-9000 |

**1 Period.** Prepare a separate Form 843 for each tax period or fee year.
From 10/01/2016 to 12/31/2016

**2 Amount** to be refunded or abated: $ 50.00

**3 Type of tax or fee.** Indicate the type of tax or fee to be refunded or abated or to which the interest, penalty, or addition to tax is related.

☐ Employment ☐ Estate ☐ Gift ☒ Excise ☐ Income ☐ Fee

**4 Type of penalty.** If the claim or request involves a penalty, enter the Internal Revenue Code section on which the penalty is based (see instructions). IRC section: N/A

**5a Interest, penalties, and additions to tax.** Check the box that indicates your reason for the request for refund or abatement. (If none apply, go to line 6.)

☐ Interest was assessed as a result of IRS errors or delays.
☐ A penalty or addition to tax was the result of erroneous written advice from the IRS.
☐ Reasonable cause or other reason allowed under the law (other than erroneous written advice) can be shown for not assessing a penalty or addition to tax.

**b** Date(s) of payment(s) ▶

**6 Original return.** Indicate the type of fee or return, if any, filed to which the tax, interest, penalty, or addition to tax relates.

☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945
☐ 990-PF ☐ 1040 ☐ 1120 ☐ 4720 ☒ Other (specify) ▶ 720

**7 Explanation.** Explain why you believe this claim or request should be allowed and show the computation of the amount shown on line 2. If you need more space, attach additional sheets.

Refund claim is submitted to preserve taxpayers' rights in Appeal of excise tax assessment by Internal Revenue Service.

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the officer's title must be shown.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature (spouse, if joint return) Date

| **Paid Preparer Use Only** | | | | |
|---|---|---|---|---|
| Print/Type preparer's name<br>John Howard, CPA | Preparer's signature<br>John Howard | Date<br>7/11/2018 | Check ☐ if self-employed | PTIN<br>P00038737 |
| Firm's name ▶ Baca & Howard, P.C. | | | Firm's EIN ▶ 45Redacted | |
| Firm's address ▶ 2155 Louisiana NE Ste 7000, Albuquerque, NM 87110 | | | Phone no. | |

**For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.** Form **843** (Rev. 8-2011)

JSA
6W8122 1.000

001206

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

**FIRST STATE BANK**
SOCORRO, NM 87801
95-195/1122

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100************************************************************************************************************ DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 04/01/15-06/30/15
Redacted

WARNING BAND

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001206
50.00

Cash - FSB Socorro Redacted 04/01/15-06/30/15 50.00

001207

FIRST STATE BANK
SOCORRO, NM 87801
95-195/1122

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100****************************************************************************************************** DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 07/01/15-09/30/15

Redacted

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001207

50.00

Cash - FSB Socorro Redacted 07/01/15-09/30/15 50.00

Security features are included. Details on back.

001208

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

**FIRST STATE BANK**
SOCORRO, NM 87801
95-195/1122

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100*************************************************************************************************** DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 10/01/15-12/31/15
Redacted

Sandra E. Marquez

THIS WARNING BAND.

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001208
50.00

Cash - FSB Socorro Redacted 10/01/15-12/31/15 50.00

Security features are included. Details on back.

001209

FIRST STATE BANK
SOCORRO, NM 87801
95-195/1122

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100*************************************************************************************************** DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 01/01/16-03/31/16
Redacted

[signature]

HIS WARNING BAND.

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001209

50.00

Cash - FSB Socorro Redacted 01/01/16-03/31/16 50.00

Security features are included. Details on back.

001210

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

**FIRST STATE BANK**
SOCORRO, NM 87801
95-195/1122

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100************************************************************************************************************* DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 04/01/16-06/30/16

Redacted

Sandra E. Marquez

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001210

50.00

Cash - FSB Socorro Redacted 04/01/16-06/30/16 50.00

Security features are included. Details on back

001211

**BACA & HOWARD, P.C.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

**FIRST STATE BANK**
SOCORRO, NM 87801
95-196/1122

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100********************************************************************************************************************** DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 07/01/16-09/30/16
Redacted

HIS WARNING BAND.

**BACA & HOWARD, P.C./2155 LOUISIANA BLVD NE #7000**

DEPARTMENT OF THE TREASURY 7/12/2018 001211
50.00

Cash - FSB Socorro Redacted 07/01/16-09/30/16 50.00

Security features are included. Details on back.

001212

**BACA & HOWARD, PC.**
2155 LOUISIANA BLVD NE #7000
ALBUQUERQUE, NM 87110

**FIRST STATE BANK**
SOCORRO, NM 87801
95-195/1122

7/12/2018

PAY TO THE ORDER OF DEPARTMENT OF THE TREASURY $ **50.00

Fifty and 00/100************************************************************************************************************ DOLLARS

DEPARTMENT OF THE TREASURY

MEMO Redacted 10/01/16-12/31/16

Redacted

THIS WARNING BAND...

**BACA & HOWARD, PC./2155 LOUISIANA BLVD NE #7000**

| | | | |
|---|---|---|---|
| DEPARTMENT OF THE TREASURY | 7/12/2018 | 001212 | 50.00 |

| | | | |
|---|---|---|---|
| Cash - FSB Socorro | Redacted | 10/01/16-12/31/16 | 50.00 |

"Corrected. See new response date".

**Internal Revenue Service**
2864 South Circle Dr
Colorado Springs, Colorado 80906

Date: May 15, 2018

RECEIVED MAY 24 2018

**Department of the Treasury**

Taxpayer Identification Number:
Redacted
Form:
720
Tax Period(s) Ended and Deficiency Amount(s):
See Form 5385

CSI Aviation INC
Ashley Dunn
3700 Rio Grande Blvd NW Ste 1
Albuquerque, New Mexico 87107

Person to Contact:
Richard Sorrell

Contact Telephone Number:
719-226-3268

Employee Identification Number:
1000705451

Last Date to Respond to this Letter:
June 15, 2018

Dear Ashley,

We have enclosed an examination report showing proposed changes to your tax for the period(s) shown above. Please read the report, and tell us whether you agree or disagree with the changes by the date shown above.

**If you agree with the proposed changes...**

1. Sign and date the enclosed agreement form.

2. Return the signed agreement form to us.

3. Enclose payment for tax, interest and any penalties due. Make your check or money order payable to the **United States Treasury.** You can call the person identified above to determine the total amount due as of the date you intend to make payment.

4. After we receive your signed agreement form, we will close your case.

If you pay the full amount due now, you will limit the amount of interest and penalties charged to your account. If you agree with our findings, but can only pay part of the bill, please call the person identified above to discuss different payment options. We may ask you to complete a collection information statement to determine your payment options, such as paying in installments. You can also write to us or visit your nearest IRS office to explain your circumstances. If you don't enclose payment for the additional tax, interest, and any penalties, we will bill you for the unpaid amounts.

**If you don't agree with the proposed changes...**

1. You may request a meeting or telephone conference with the supervisor of the person identified in the heading of this letter. If you still don't agree after the meeting or telephone conference, you can:

2. Request a conference with our Appeals Office. If the total proposed change to your tax is:

   - $25,000 or less for *each* referenced tax period, send us a letter requesting consideration by Appeals. Indicate the issues you don't agree with and the reasons why you don't agree. If you don't want to write a separate letter, you can complete the Statement of Disputed Issues at the end of this letter and return it to us.

   - More than $25,000 for *any* referenced tax period; you must submit a formal protest.

If you request a conference with our Appeals Office, an Appeals Officer will call you (if necessary) for an appointment to take a fresh look at your case. The Appeals Office is an independent office and most disputes considered by the Appeals Office are resolved informally and promptly. By requesting a conference with our Appeals Office you may resolve the matter sooner and/or prevent interest and any penalties from increasing on your account.

The requirements for filing a formal protest are explained in the enclosed Publication 3498, *The Examination Process.* Publication 3498 also includes information on your *Rights as a Taxpayer* and the *IRS Collection Process.*

You must mail your signed agreement form, completed Statement of Disputed Issues, or a formal protest to us by the response date show in the heading of this letter. If you decide to request a conference with the examiner's supervisor, your request should also be made by the response date indicated.

MAIL RESPONSES TO: **Internal Revenue Service**
Attn: Richard Sorrell
2864 South Circle Dr
Colorado Springs, Colorado 80906

If we don't hear from you by the response date shown in the heading of this letter, we will have to process your case on the basis of the adjustments shown in the enclosed statement.

If you have any questions, please contact the person whose name and telephone number are shown above.

Thank you for your cooperation.

Sincerely yours,

Richard Sorrell

Richard Sorrell
Internal Revenue Agent (Excise Tax)

Enclosures:
Copy of this letter
Examination Report
Form 13683
Publication 3498
Envelope

| Form **13683** (June 2005) | Department of the Treasury — Internal Revenue Service **Statement of Disputed Issues** | Sheet ____ of ____ |
|---|---|---|

*("x" box if applicable)*

☐ The proposed change is $25,000 **or** less for each of the Referenced Tax Period*(s)*.

**Issue*(s)* I Disagree with:**

**Reason*(s)* for Disagreement:**

***(If more space is needed, attach an additional sheet)***

| Signature | Date |
|---|---|

# Excise Tax Examination Changes

Form number
720

Taxpayer's name and address
CSI Aviation INC
3700 Rio Grande Blvd NW Ste 1
Albuquerque, New Mexico 87107

Social Security Number or Employer Identification Number
Redacted

Person with whom examination changes were discussed *(and title)*
John Howard POA

| Period Ended (1) | IRS Number or CRN (2) | Kind of Tax (3) | Corrected Tax Liability or Credit per Exam (4) | Tax or Credit per Return or Previous Assessment (5) | Tax or Credit Increase or *(Decrease)* *(4 - 5)* (6) | Penalties *(See Explanation)* (7) | Total Tax and Penalties Due or *(Refund)* (8) |
|---|---|---|---|---|---|---|---|
| Mar 31, 2015 | 026 | FAC | 1,342,728.10 | 19,709.49 | 1,323,018.61 | 0.00 | 1,323,018.61 |
| Jun 30, 2015 | 026 | FAC | 1,030,342.50 | 36,954.52 | 993,387.98 | 0.00 | 993,387.98 |
| Sep 30, 2015 | 026 | FAC | 741,793.02 | 14,352.55 | 727,440.47 | 0.00 | 727,440.47 |
| Dec 31, 2015 | 026 | FAC | 1,019,911.01 | 18,734.76 | 1,001,176.25 | 0.00 | 1,001,176.25 |
| Mar 31, 2016 | 026 | FAC | 758,109.65 | 6,764.85 | 751,344.80 | 0.00 | 751,344.80 |
| Jun 30, 2016 | 026 | FAC | 1,076,166.06 | 10,590.10 | 1,065,575.96 | 0.00 | 1,065,575.96 |
| Sep 30, 2016 | 026 | FAC | 978,578.73 | 15,292.11 | 963,286.62 | 0.00 | 963,286.62 |
| Dec 31, 2016 | 026 | FAC | 1,357,591.54 | 14,821.71 | 1,342,769.83 | 0.00 | 1,342,769.83 |
| Mar 31, 2017 | 026 | FAC | 1,115,504.85 | 8,201.76 | 1,107,303.09 | 0.00 | 1,107,303.09 |
| Jun 30, 2017 | 026 | FAC | 1,087,493.00 | 18,796.70 | 1,068,696.30 | 0.00 | 1,068,696.30 |
| Sep 30, 2017 | 026 | FAC | 929,754.11 | 9,843.19 | 919,910.92 | 0.00 | 919,910.92 |

Other information

Examiner
1000705451/Richard Sorrell Richard Sorrell

SBSE Excise
Territory WT Group 1511

Date
05/15/2018

Form **5385** (Rev. 6-2015) Catalog Number 42486Q publish.no.irs.gov Department of the Treasury - **Internal Revenue Service**

**Form 886A**

CSI Aviation Redacted
Excise Tax Audit
Quarterly periods 2015 Q1 - 2017 Q3
Prepared by Richard Sorrell, Revenue Agent

| 720 Quarterly Period | Taxable Transportation IRC 4261(a) & (b) Per previously-filed Form 720 For activities not covered in this 886A. | Taxable Transportation ICE-related Flights IRC 4261(a)&(b) | Total Taxable Transportation IRC 4261(a) & (b) Per Audit Including ICE-related Flights | Additional Assessment per Audit |
|---|---|---|---|---|
| 2015 Q1 | $19,709.49 | $1,323,018.61 | $1,342,728.10 | $1,323,018.61 |
| 2015 Q2 | $36,954.52 | $993,387.98 | $1,030,342.50 | $993,387.98 |
| 2015 Q3 | $14,352.55 | $727,440.47 | $741,793.02 | $727,440.47 |
| 2015 Q4 | $18,734.76 | $1,001,176.25 | $1,019,911.01 | $1,001,176.25 |
| 2016 Q1 | $6,764.85 | $751,344.80 | $758,109.65 | $751,344.80 |
| 2016 Q2 | $10,590.10 | $1,065,575.96 | $1,076,166.06 | $1,065,575.96 |
| 2016 Q3 | $15,292.11 | $963,286.62 | $978,578.73 | $963,286.62 |
| 2016 Q4 | $14,821.71 | $1,342,769.83 | $1,357,591.54 | $1,342,769.83 |
| 2017 Q1 | $8,201.76 | $1,107,303.09 | $1,115,504.85 | $1,107,303.09 |
| 2017 Q2 | $18,796.70 | $1,068,696.30 | $1,087,493.00 | $1,068,696.30 |
| 2017 Q3 | $9,843.19 | $919,910.92 | $929,754.11 | $919,910.92 |

**ISSUE**
Whether, in the situation described below, Contractor is required to collect from Agency the taxes imposed by§ 4261 (air transportation of persons excise taxes) of the Internal Revenue Code (Code).

**FACTS**
Definitions used in this 886A:
Contractor = CSI Aviation , Inc.
Agency = Immigration and Customs Enforcement (ICE), United States Department of Homeland Security
Individual A person identified by ICE for deportation (removal) from the United

States
Air Carrier = Various air transportation service providers subcontracted by CSI Aviation, Inc.
Ice Location Hub (hub) = One of six cities located within the United States used by ICE to stage foreign nationals for transportation to locations outside of the United States
Activities = Various steps of the removal process, including, but not limited to, resolving legal issues; receiving final approval from a judge to remove; and confirming that the destination foreign government will accept the foreign national.

Agency is an agency of the United States government. Contractor is an aviation company that provides various air transportation services. Under the terms of a contract with Agency, Contractor provides unscheduled, on demand air charter services to transport Individual. These services include point-to-point air transportation within the United States, as well as air transportation from the United States to destinations outside of the United States or the 225-mile zone described in§ 4262(c)(2) (foreign destination). Agency pays Contractor a fixed hourly rate per flight hour actually flown. Agency has the right to fly as many flight hours as it deems necessary and to occupy every seat on each flight. Contractor's services are provided through its subcontract with Air Carrier; under the subcontract, Air Carrier provides Contractor with aircraft on a wet lease basis.

The air transportation services Contractor provides to Agency are generally comprised of three phases:
• In the first phase, Contractor transports Individual by air from a location within the United States to Hub (domestic leg); Hub is also in the United States. Note: Sometimes, individual is transported to hub location via transportation that is unknown to Contractor. That transportation is outside the purview of this audit.
• In the second phase, Individual spends a period of time on the ground at Hub (interval). At Hub, Activities may take place and each Individual who will travel to the same foreign destination is grouped onto the same flight. Once agency gives orders, Contractor then directs Air Carrier to transport Individual to Individual's foreign destination.
• In the third phase, Contractor transports Individual by air from Hub to Individual's foreign destination aboard Air Carrier's aircraft (international leg).
Individual's entire itinerary is not known by Individual or Contractor prior to the departure of Individual's domestic leg flight. Thus, Individual's flight from Hub to Individual's foreign destination is not scheduled until after Individual arrives at Hub.
The amount of time needed to complete Activities varies from Individual to Individual. As a result, the interval between when Individual arrives at Hub and when Individual departs Hub varies from a few hours to several days; individual's interval at Hub may exceed twelve hours. Generally, the total length of time of the interval at Hub is beyond the control of Contractor or Air Carrier; it typically depends on how quickly Individual completes Activities. In some cases, however, Individual's interval at Hub may increase because of delays in the arrival or departure of the aircraft scheduled to fly Individual.
All of Air Carrier's aircraft that are provided under its subcontract with Contractor have a maximum certificated take-off weight of more than 6,000 pounds. The aircraft do not operate from a rural airport as that term is defined in § 4261 (e)(1 )(B).
Contractor collects and pays over to the IRS the tax imposed by§ 4261 (c) on amounts paid by Agency to transport Individual. Contractor does not collect and pay over to the IRS the taxes imposed by§ 4261 (a) and (b)

CSI provides air-transportation charter services to customers other than ICE. This audit didn't address those services and will not be covered in this 886A. The 4261(a)&(b) tax shown on previously-filed Form 720's is for these customers.

## LAW

Section 4261 (a) imposes a tax on the amount paid for the taxable transportation of any person (percentage tax).
Section 4261(b) imposes a tax on amounts paid for each domestic segment of taxable transportation (domestic segment tax). A "domestic segment" is defined in§ 4261 (b)(2) as any segment consisting of one takeoff and one landing and which is taxable transportation.
Section 4261(c)(1) imposes a tax of $12.00 (adjusted annually for inflation) on any amount paid (whether within or without the United States) for any transportation of any person by air, if such transportation begins or ends in the United States (international travel facilities tax).
Section 4261(c)(2) provides that§ 4261(c)(1) does not apply to any transportation all of which is taxable under§ 4261 (a) (determined without regard to§§ 4281 and 4282).
Section 4261 (d) provides that the tax is paid by the person making the payment subject to tax and § 4291 provides that the tax is collected by the person receiving the payment.
Section 4261 ( e )( 1 )(A) exempts from the domestic segment tax amounts paid for segments beginning or ending at rural airports (rural airport exception). Section 4261 (e)(1 )(B) defines the term "rural airport" as any airport if:
(i) there were fewer than 100,000 commercial passengers departing by air (in the case of any airport not connected by paved roads to another airport, on flight segments of at least 100 miles) during the second preceding calendar year from such airport; and
(ii) such airport: (I) is not located within 75 miles of another airport which is not described in § 4261 (e)(1 )(B)(i), (II) is receiving essential air service subsidies as of the date of the enactment of§ 4261 (e)(1 ), or (III) is not connected by paved roads to another airport.
Section 49.4261-7(h)(2) of the Facilities and Services Excise Tax Regulations provides, in relevant part, that a charterer of a conveyance that sells transportation to other persons must collect and account for the air transportation excise taxes with respect to all amounts paid to the charterer for the transportation. In such case, no tax will be due on the amount paid by the charterer to the charter provider for the charter of the conveyance.
Section 4262(a)(1) defines "taxable transportation" for purposes of§ 4261 as (1) transportation by air that begins in the United States or in the 225-mile zone (that portion of Canada and Mexico that is not more than 225 miles from the nearest point in the continental United States) and ends in the United States or in the 225-mile zone, and (2) in the case of transportation other than transportation described in (1 ), that portion of such transportation that is directly or indirectly from one port or station in the United States to another port or station in the United States, but only if such portion is not a part of uninterrupted international air transportation.
Section 4262(c)(3) defines the term "uninterrupted international air transportation" as any transportation by air which is not transportation described in§ 4262(a)(1) and in which - (A) the scheduled interval between (i) the beginning or end of the portion of such transportation which is directly or indirectly from one port or station in the United States to another port or station in the United States and (II) the end or beginning of the other portion of such transportation is not more than twelve hours, and (B) the

scheduled interval between the beginning or end and the end or beginning of any two segments of the portion of such transportation referred to in § 4262(c)(3)(A)(i) is not more than twelve hours.

Section 49.4262(c)-1 (c) provides rules relating to the term "uninterrupted international air transportation". Section 49.4262(c)-1(c)(2) provides, in relevant part, that where the interval between arrival and departure time at any stopover point in the United States exceeds twelve[1] hours, such transportation is not uninterrupted International air transportation even though the schedules of the airlines do not make possible a scheduling within the twelve-hour limit. Where any interval scheduled for twelve hours or less is increased to exceed twelve hours, the transportation will continue to be uninterrupted international air transportation if the increase in time is attributable to delays in the arrival or departure of the scheduled air transportation. In such case the transportation shall continue to be uninterrupted international air transportation if the passenger continues the passenger's transportation no later than on the first available flight offered by the continuing carrier which affords the passenger substantially the same accommodations as originally purchased. However, if for any other reason such interval at any stopover is increased to more than twelve hours, the transportation will lose its classification as uninterrupted international air transportation.

The regulations further provide that transportation from the point of origin in the United States to a port or station outside the United States and the 225-mile zone, with a stopover in the United States, must be scheduled before the time the initial transportation commences in order for the United States portion of such transportation to qualify as uninterrupted international air transportation.

Section 4262(d) defines the term "transportation" to include layover or waiting time and movement of the aircraft in deadhead service.

Section 4263(c) provides, in relevant part, that where any tax imposed by§ 4261 is not paid at the time payment for transportation is made, then such tax shall be paid by the carrier providing the initial segment of such transportation which begins or ends in the United States.

Section 4281 provides that the taxes imposed by§ 4261 do not apply to transportation by an aircraft having a maximum certificated takeoff weight of 6,000 pounds or less, except when the aircraft is operated on an established line or when such aircraft is a jet aircraft.

Rev. Rul. 64-6, 1964-1 C.B. 397, which involves the international travel of a military service member and his dependent, applies§ 49.4262(c)-1 (c)(2) in a two-step analysis. First, the revenue ruling examines whether the entire trip is scheduled prior to the time the initial transportation commences. Second, the revenue ruling examines whether the scheduled interval between the foreign and domestic portions is twelve hours or less. If both of these inquiries are answered in the affirmative, then the domestic portion of the air transportation is part of uninterrupted international air transportation. Importantly, the revenue ruling performs this analysis on a passenger-by-passenger basis (that is, on each individual passenger's travel itinerary).

[1] Section 281A of the Tax Equity and Fiscal Responsibility Act of 1982, P.L. 97-248, 96 Stat 324,increased the allowable interval in§ 4262(c)(3) from six hours to twelve hours effective for transportation beginning after August 31, 1982. The regulations were not updated to reflect this change. To avoid confusion, in this memorandum we substituted "twelve" for "six" when the cited published guidance still references a six-hour interval.

## ANALYSIS AND CONCLUSIONS

As an initial matter, generally, amounts paid for taxable transportation by the United States government are not exempt from the air transportation of persons excise taxes unless a waiver is authorized by the Secretary of the Treasury pursuant to the rules provided in § 4293. No waiver is authorized in relation to Agency.

In addition, the aircraft used by Contractor to provide air transportation services to Agency have a maximum certificated take-off weight of more than 6,000 pounds. Therefore, the exception to the air transportation of persons excise taxes provided in § 4281 does not apply to the air transportation services at issue here. Similarly, the services at issue here are not provided using aircraft that operate from a § 4261(e)(1)(B) rural airport. Therefore, the rural airport exception to the domestic segment tax provided by§ 4261 (e)(1 )(A) does not apply to the air transportation services at issue here.

Further, under§ 49.4261-7(h)(2), a charterer of a conveyance that sells transportation to other persons must collect and account for the air transportation excise taxes with respect to all amounts paid to the charterer for transportation. In such case, no tax will be due on the amount paid by the charterer to the charter provider for the charter of the conveyance. Thus, when any of the air transportation of persons excise taxes attaches to amounts paid by Agency to Contractor for air transportation services, Agency is the taxpayer and Contractor is required to collect and pay over the taxes to the IRS. Further, the air transportation of persons excise taxes do not attach to amounts Contractor paid to Air Carrier under their wet lease subcontract arrangement.

We first examine the excise tax consequences related to the domestic leg of the air transportation services provided by Contractor to Agency. We then examine the excise tax consequences of the international leg of the air transportation services provided by Contractor to Agency.

*Domestic Leg*

The percentage tax applies to amounts paid for taxable transportation of any person. Taxable transportation is transportation by air that begins and ends in the United States or in the 225-mile zone, unless it is part of uninterrupted international air transportation. The domestic segment tax is imposed on amounts paid for each domestic segment of taxable transportation. A domestic segment consists of one takeoff and one landing and which is taxable transportation, unless it is part of uninterrupted international air transportation.

The domestic leg of the air transportation services Contractor provides to Agency involves flying Individual from one location within the United States to Hub, which is also within the United States. Because the domestic leg is air transportation that begins and ends in the United States that consists of one takeoff and one landing, it is a domestic segment of taxable transportation unless it is part of uninterrupted international air transportation.

To determine whether the domestic leg is part of uninterrupted international air transportation, we apply the two-step analysis described in Rev. Rul. 64-6. This analysis is performed on a passenger-by-passenger basis. First, we must examine whether the entire trip for Individual is scheduled prior to the time the initial transportation (in this case, the domestic leg) commences. Second, we must examine whether the scheduled interval between Individual's domestic leg and international leg is twelve hours or less.

Under the facts presented, Individual's flight from Hub to Individual's foreign destination is not scheduled until after Individual arrives at Hub. The domestic leg is not part of uninterrupted international air transportation because Individual's entire trip is not

scheduled prior to the time that the initial transportation commences. (See Exhibit 1 for contracts stating transportation is unscheduled air charter services). Under § 49.4262(c)-1 (c)(2), even if Individual actually departs Hub within twelve hours of the Individual's arrival at Hub, the domestic segment will not become part of uninterrupted international air transportation. Thus, the domestic leg is taxable transportation and amounts paid to Contractor for the domestic leg are taxable under§ 4261 (a), but not under§ 4261 (c).

As discussed above, the domestic leg is a domestic segment unless it is part of uninterrupted international air transportation. Because we determined that the domestic leg is not part of uninterrupted international air transportation, the§ 4261(b) tax applies to amounts paid to Contractor for the domestic leg.

In sum, where Individual's entire itinerary is not scheduled prior to the time that the initial transportation commences (such as under the facts described above), Contractor is required to collect both the percentage tax imposed by§ 4261 (a) and the domestic segment tax imposed by § 4261 (b) for amounts paid for the domestic leg. If Contractor does not collect these taxes from Agency at the time payment for this air transportation is made, pursuant to§ 4263(c), Contractor is required to pay these taxes to the IRS.

*International Leg*

The international leg of the air transportation services provided by Contractor to Agency involves flying from Hub to a destination outside of the United States or 225-mile zone. The international leg is not taxable transportation because it is air transportation that begins, but does not end, in the United States. Therefore, the§ 4261 (c) tax applies to amounts paid to Contractor for the international leg, but are not taxable under§ 4261 (a) and (b). Accordingly, Contractor is required to collect the§ 4261(c) tax for amounts paid for the international leg.

**Fuel Claim Consideration.** CSI files a quarterly claim for fuel consumed by the ICE-related flights discussed in this 886A. It's noteworthy that in its claims, CSI distinguishes between two types of flights. 1) For the segments beginning and ending in the United States, CSI files a partial claim for excise tax on fuel used in "commercial transportation". This fuel claim is for domestic flights only. It's not a claim for international trade flights. 2) For the international segments, CSI files a full claim under IRC 4092 for non-taxable use in international trade. The definition for international differs between IRC 4261 & IRC 4092. However, it's noteworthy that CSI is treating the ICE-related flights flown between two domestic segments as commercial domestic flights. For fuel purposes, CSI is only treating the flights that begin or end in a foreign country as fuel consumed in foreign trade.

**CSI response.** An official written response has not been received, but it is expected that CSI will disagree with the government's position and will file an appeal.

Summary Adjustments

| | AEX | AEX 1 | AEX 2 | Bro1 | Bro 2 | IWA |
|---|---|---|---|---|---|---|
| 2015 Q1 | $ 4,314.00 | $ 30,125.52 | $ 91,881.68 | $ 66,572.03 | $ 31,320.36 | |
| 2015 Q2 | | $ 25,399.69 | $ 123,915.34 | $ 21,411.85 | $ 27,515.43 | |
| 2015 Q1 | | $ 66,671.95 | $ 121,137.74 | $ 136,765.08 | $ 81,688.58 | |
| 2015 Q2 | | $ 89,511.83 | $ 87,579.73 | $ 88,511.37 | $ 14,802.49 | |
| 2015 Q3 | | $ 94,804.53 | $ 103,195.66 | $ 113,119.59 | | |
| 2015 Q4 | | $ 144,137.62 | $ 83,613.26 | $ 280,444.33 | $ 9,289.72 | |
| 2016 Q1 | | $ 119,098.50 | $ 100,615.00 | $ 154,437.21 | $ 6,774.78 | |
| 2016 Q2 | | $ 50,313.59 | $ 37,712.82 | $ 62,515.96 | | |
| 2016 Q2 | | $ 151,376.46 | $ 31,586.88 | $ 122,297.36 | $ 10,201.71 | $ 13,515.80 |
| 2016 Q3 | $ 15,258.40 | $ 201,303.58 | $ 57,053.78 | $ 172,121.96 | $ 28,556.30 | |
| 2016 Q4 | $ 16,468.64 | $ 271,163.46 | $ 39,250.35 | $ 216,780.67 | $ 50,179.08 | $ 7,431.53 |
| 2017 Q1 | $ 20,010.33 | $ 144,840.90 | $ 89,108.34 | $ 194,826.80 | $ 4,746.56 | |
| 2017 Q2 | $ 8,696.48 | $ 169,729.57 | $ 90,745.71 | $ 166,303.98 | $ 23,281.64 | $ 24,806.30 |
| 2017 Q3 | | $ 136,903.00 | $ 69,456.89 | $ 180,946.74 | $ 10,568.17 | $ 22,616.15 |

There are duplicate rows for some periods, because CSI supplied documents for some periods in multiple

| IWA1 | IWA 2 | IWA 3 | MIA | SAT 1 | SAT 2 | |
|---|---|---|---|---|---|---|
| $ 30,258.30 | $ 45,301.00 | $ 56,465.60 | $ 63,549.52 | $ 17,628.38 | $ 9,434.74 | $ 446,851.12 |
| $ 18,113.78 | $ 32,160.81 | $ 38,663.54 | $ 38,714.72 | $ 21,107.69 | $ 7,647.53 | $ 354,650.38 |
| $ 70,439.92 | $ 107,274.17 | $ 107,250.10 | $ 124,333.72 | $ 39,119.78 | $ 21,486.44 | $ 876,167.49 |
| $ 99,851.03 | $ 23,353.48 | $ 83,833.73 | $ 85,908.86 | $ 50,458.81 | $ 14,926.27 | $ 638,737.60 |
| $ 108,838.72 | | $ 119,744.05 | $ 101,847.19 | $ 70,828.80 | $ 15,061.93 | $ 727,440.48 |
| $ 166,444.42 | | $ 121,924.57 | $ 143,944.21 | $ 47,264.57 | $ 4,113.55 | $ 1,001,176.25 |
| $ 121,287.90 | $ 21,219.99 | $ 98,435.88 | $ 115,476.37 | $ 8,499.33 | $ 5,499.84 | $ 751,344.79 |
| $ 80,938.64 | $ 17,841.13 | $ 37,490.14 | $ 66,001.46 | $ 9,269.26 | | $ 362,082.99 |
| $ 133,115.06 | $ 33,279.22 | $ 85,970.69 | $ 73,501.53 | $ 42,798.03 | $ 5,850.22 | $ 703,492.97 |
| $ 166,445.83 | $ 64,792.57 | $ 102,095.64 | $ 108,409.83 | $ 43,925.61 | $ 3,323.12 | $ 963,286.62 |
| $ 261,165.30 | $ 85,288.34 | $ 142,283.18 | $ 132,964.35 | $ 101,467.99 | $ 18,326.95 | $ 1,342,769.83 |
| $ 218,757.59 | $ 67,921.89 | $ 145,140.76 | $ 141,108.01 | $ 67,803.88 | $ 13,038.01 | $ 1,107,303.09 |
| $ 188,944.24 | $ 16,772.21 | $ 167,314.49 | $ 147,544.74 | $ 59,766.11 | $ 4,790.82 | $ 1,068,696.30 |
| $ 164,328.20 | $ 38,437.52 | $ 146,924.05 | $ 110,757.71 | $ 35,911.22 | $ 3,061.27 | $ 919,910.92 |
| | | | | | | $ 11,263,910.83 |

: workbooks.

"Corrected report"



# Excise Tax Examination Changes

Form number 720

Taxpayer's name and address
CSI Aviation INC
3700 Rio Grande Blvd NW Ste 1
Albuquerque, New Mexico 87107

Social Security Number or Employer Identification Number
Redacted

Person with whom examination changes were discussed (and title)
John Howard, POA

| Period Ended (1) | IRS Number or CRN (2) | Kind of Tax (3) | Corrected Tax Liability or Credit per Exam (4) | Tax or Credit per Return or Previous Assessment (5) | Tax or Credit Increase or *(Decrease) (4 - 5)* (6) | Penalties *(See Explanation)* (7) | Total Tax and Penalties Due or *(Refund)* (8) |
|---|---|---|---|---|---|---|---|
| Mar 31, 2015 | 026 | FAC | 1,342,728.10 | 19,709.49 | 1,323,018.61 | 0.00 | 1,323,018.61 |
| Mar 31, 2015 | 027 | FAC | 355,092.50 | 355,092.50 | 0.00 | 0.00 | 0.00 |
| Mar 31, 2015 | 060 | MAN | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Jun 30, 2015 | 026 | FAC | 1,030,342.50 | 36,954.52 | 993,387.98 | 0.00 | 993,387.98 |
| Jun 30, 2015 | 027 | FAC | 398,381.90 | 398,381.90 | 0.00 | 0.00 | 0.00 |
| Sep 30, 2015 | 026 | FAC | 741,793.02 | 14,352.55 | 727,440.47 | 0.00 | 727,440.47 |
| Sep 30, 2015 | 027 | FAC | 379,771.20 | 379,771.20 | 0.00 | 0.00 | 0.00 |
| Dec 31, 2015 | 026 | FAC | 1,019,911.01 | 18,734.76 | 1,001,176.25 | 0.00 | 1,001,176.25 |
| Dec 31, 2015 | 027 | FAC | 416,498.70 | 416,498.70 | 0.00 | 0.00 | 0.00 |
| Mar 31, 2016 | 026 | FAC | 758,109.65 | 6,764.85 | 751,344.80 | 0.00 | 751,344.80 |
| Mar 31, 2016 | 027 | FAC | 422,428.20 | 422,428.20 | 0.00 | 0.00 | 0.00 |
| Jun 30, 2016 | 026 | FAC | 1,076,166.06 | 10,590.10 | 1,065,575.96 | 0.00 | 1,065,575.96 |
| Jun 30, 2016 | 027 | FAC | 330,570.50 | 330,570.50 | 0.00 | 0.00 | 0.00 |
| Sep 30, 2016 | 026 | FAC | 978,578.73 | 15,292.11 | 963,286.62 | 0.00 | 963,286.62 |
| Sep 30, 2016 | 027 | FAC | 437,183.78 | 437,183.78 | 0.00 | 0.00 | 0.00 |
| Dec 31, 2016 | 026 | FAC | 1,357,591.54 | 14,821.71 | 1,342,769.83 | 0.00 | 1,342,769.83 |
| Dec 31, 2016 | 027 | FAC | 503,617.42 | 503,617.42 | 0.00 | 0.00 | 0.00 |
| Mar 31, 2017 | 026 | FAC | 1,115,504.85 | 8,201.76 | 1,107,303.09 | 0.00 | 1,107,303.09 |
| Mar 31, 2017 | 027 | FAC | 534,640.80 | 534,640.80 | 0.00 | 0.00 | 0.00 |
| Jun 30, 2017 | 026 | FAC | 1,087,493.00 | 18,796.70 | 1,068,696.30 | 0.00 | 1,068,696.30 |

Other information

This corrected report supersedes report dated 5-15-2018. This corrected report includes Abstract 027 (periods 201503-201709) and Abstract 060 (period 201503). Abstracts 027 & 060 show no adjustment in tax for all periods.

| Examiner | SBSE Excise | | Date |
|---|---|---|---|
| 1000705451/Richard Sorrell *Richard Sorrell* | Territory WT | Group 1511 | 05/16/2018 |

"Corrected report"

Page 2 of 2

# Excise Tax Examination Changes

Form number
720

Taxpayer's name and address
CSI Aviation INC
3700 Rio Grande Blvd NW Ste 1
Albuquerque, New Mexico 87107

Social Security Number or Employer Identification Number
Redacted

Person with whom examination changes were discussed *(and title)*
John Howard, POA

| Period Ended (1) | IRS Number or CRN (2) | Kind of Tax (3) | Corrected Tax Liability or Credit per Exam (4) | Tax or Credit per Return or Previous Assessment (5) | Tax or Credit Increase or *(Decrease)* *(4 - 5)* (6) | Penalties *(See Explanation)* (7) | Total Tax and Penalties Due or *(Refund)* (8) |
|---|---|---|---|---|---|---|---|
| Jun 30, 2017 | 027 | FAC | 413,725.40 | 413,725.40 | 0.00 | 0.00 | 0.00 |
| Sep 30, 2017 | 026 | FAC | 929,754.11 | 9,843.19 | 919,910.92 | 0.00 | 919,910.92 |
| Sep 30, 2017 | 027 | FAC | 395,931.81 | 395,931.81 | 0.00 | 0.00 | 0.00 |

Other information
This corrected report supersedes report dated 5-15-2018. This corrected report includes Abstract 027 (periods 201503-201709) and Abstract 060 (period 201503). Abstracts 027 & 060 show no adjustment in tax for all periods.

Examiner
1000705451/Richard Sorrell Richard Sorrell

SBSE Excise
Territory WT
Group 1511

Date
05/16/2018

**Internal Revenue Service**
**2864 S. Circle Dr Suite 7000**
Colorado Springs, CO. 80918

**Department of the Treasury**

Tax Form:
720

Tax Period Ended:
201503-
201709

Time extended to:
July 13, 2018

Date: 6-5-2018

Contact Person:
Richard Sorrell

Employee Identification Number:
1000705451

Telephone Number:
719-226-3268

John Howard, CPA
2155 Louisiana Blvd NE. Ste 7000
Albuquerque, NM. 87110

Dear Mr. Howard:

Thank you for letting us know that you need more time to:

- ☐ Send us the information we requested.
- ☐ Come in for an interview.
- ☒ Send us a written protest.
- ☒ Request a hearing with the Appeals office.
- ☒ Note: This approval for extra time is for CSI Aviation, **Redacted**

As you can see above, we've extended your time to respond. We hope that this extension will give you sufficient time to attend to the matter.

Please call us with any questions you may have. Thank you for your cooperation.

Sincerely,

Tom Deis

Tom Deis
Excise Group Manager 1511

OFFICE OF INSPECTOR GENERAL

# ICE Air Transportation of Detainees Could Be More Effective

Homeland Security

**April 9, 201**

**OIG-15-5**

# HIGHLIGHTS

## *ICE Air Transportation of Detainees Could Be More Effective*

**April 9, 2015**

## Why We Did This

U.S. Immigration and Customs Enforcement Air Operations (ICE Air) is responsible for moving and removing detainees in ICE custody by providing air transportation services to Enforcement and Removal Operations' (ERO) 24 field offices. We reviewed this program to determine whether ICE Air was ensuring the most effective use of its resources.

## What We Recommend

ICE ERO should develop formal policies and procedures for its air transportation program. It should also ensure adequate staffing, complete and reliable program data, and perform an analysis of operations to identify factors affecting efficiency.

**For Further Information:**
Contact our Office of Public Affairs at (202) 254-4100, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

Although ICE Air met its mission by transporting 930,435 detainees over a 3-1/2-year period, it could have used its resources more effectively. In fact, ICE Air may have missed opportunities to improve the program's overall effectiveness even though it has identified some ways to reduce costs associated with detainee transportation. Furthermore, ICE Air does not capture complete and accurate data essential to support operational decisions. This occurred because ERO did not provide the planning, management, and reporting tools needed to operate effectively, and it does not have a mechanism in place to obtain feedback on how well its processes are performing. ERO management has not developed a data management plan, assessed staffing and training needs, or implemented formal policies and procedures. It also has not conducted a comprehensive analysis of current operations for making informed business decisions that will safeguard the program's resources.

As a result, ICE Air operated charter flights with empty seats and could have realized cost savings of up to $41.1 million upon determining optimum flight capacity. This estimate is based on the average of charter costs incurred during the scope period for the missions analyzed. Although the estimated potential cost savings will not be claimed as funds put to better use, it is an indicator of ICE Air's potential for future cost savings.

## ICE Response

ICE concurred with all four recommendations and has begun taking actions for implementation.

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Table of Contents

Background ........ 1

Results of Audit ........ 2

Operations Could Be Improved ........ 3

- Data May Not Be Adequate for Analysis and Decision Making ........ 3
- Program Staffing, Training, and Guidance Needed ........ 5
- Missed Opportunities to Improve Efficiency ........ 8
- Conclusion ........ 11

Recommendations ........ 11
ICE Comments to Draft Report and OIG Analysis ........ 12

# Appendixes

Appendix A: Transmittal to Action Official ........ 15
Appendix B: Scope and Methodology ........ 16
Appendix C: ICE Comments to the Draft Report ........ 18
Appendix D: ICE Air Operational Costs ........ 22
Appendix E: Analysis of Charter Missions ........ 23
Appendix F: Potential Cost Savings ........ 25
Appendix G: Major Contributors to This Report ........ 27
Appendix H: Report Distribution ........ 28

# Abbreviations

| | |
|---|---|
| ARTS | Alien Repatriation Tracking System |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| FY | fiscal year |
| ICE | U.S. Immigration and Customs Enforcement |
| OIG | Office of Inspector General |
| U.S. | United States |

# Background

The United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative arm of the Department of Homeland Security (DHS). Its mission is to promote homeland security and public safety through the criminal and civil enforcement of Federal laws governing border control, customs, trade, and immigration.

The Enforcement and Removal Operations (ERO) is one of two principal operating components within ICE. ERO enforces the Nation's civil immigration laws to promote public safety, border security, and the integrity of the immigration system. ERO does this by making the removal of criminal detainees and those who pose a threat to our communities its highest priority.

Within ERO, the Repatriation Division is responsible for planning and coordinating the transportation of detainees, and developing and implementing strategies to support the return of all removable detainees to their country of origin. The Repatriation Division consists of ICE Air Operations and the Repatriation Management Division. For this review, we focused on ICE Air Operations, hereafter referred to as ICE Air, as it relates to charter flights.



**Figure 1: Detainees boarding charter flight.**
*Source*: ICE Enforcement and Removal Operations.

ICE Air's operational headquarters is located in Mesa, AZ, with some program support staff located in the Washington, DC, area. ICE Air's mission is to move and remove detainees in ICE custody by providing air transportation services to ERO's 24 field offices. ICE Air transports detainees within the United States or returns them to their countries of origin.

ICE Air uses commercial or charter flights to move detainees. Factors such as detainees' country of citizenship, criminal status, and family status will influence whether they travel commercially or by charter aircraft. The Commercial Operations Section coordinates and supports removal of detainees by field offices using commercial airlines. ICE Air transports the majority of detainees by charter aircraft within the United States and to Central America, South America, and the Caribbean. ICE Air has four contracts for routine charter flights; and these contracts provide eight aircraft, each capable of carrying a maximum of 135 detainees. It also contracts aircraft for less

frequent long-range charter flights to locations such as Europe, Africa, and Asia. ICE Air also arranges special charters to accommodate detainees with serious medical conditions, high-profile removals, or detainees who fail to comply with the removal process.

ICE Air pays, on average, $8,419 per flight hour for charter flights regardless of the number of passengers on the plane. The charter vendors provide the aircraft, the pilot, flight crew, security personnel, flight nurse, and maintenance services. The flight hour rate also includes operating expenses such as insurance, fuel, landing fees, passenger taxes, and all other miscellaneous fees and taxes associated with each flight.



**Figure 2: Aircraft staged for scheduled flights to transport detainees.**
*Source*: DHS Office of Inspector General (OIG).

The ICE Air Division's budget is contained in the Transportation and Removal Program Project Activity. This program project activity also encompasses the Removal Management Division and ground transportation. The Transportation and Removal Program operated with an average annual budget of $272 million during the period of our review, October 1, 2010, through March 31, 2014. According to ICE Air, it spent approximately $598 million for ICE Air Operations during that timeframe. Of that, approximately $464 million was for charter flights (see details in appendix D).

## Results of Audit

ICE Air Operations is responsible for moving or removing detainees in ICE custody by providing air transportation services to ERO field offices. Although ICE Air met its mission by transporting 930,435 detainees over a 3-1/2-year period, it may have been able to use its resources more effectively. ICE Air does not capture complete and accurate data essential to support operational decisions and ensure program effectiveness. For example, mission routes lack details for individual stops, ICE Air does not capture and analyze the reasons detainees miss flights, and optimum seat capacity has not been determined. ERO management does not have a mechanism in place to obtain feedback on how well its processes are performing. As a result, ERO management may have missed opportunities to improve the program's overall effectiveness.

This occurred because ERO did not provide the planning, management, and reporting tools the ICE Air program needs to operate effectively. ERO management has not developed a data management plan, assessed staffing and training needs, or implemented formal policies and procedures. It also has not conducted a comprehensive analysis of current operations for making informed business decisions that will safeguard the program's resources.

As a result, ICE Air operated charter flights with empty seats and could have realized cost savings of up to $41.1 million upon determining optimum flight capacity. This estimate is based on the average of charter costs incurred during the scope period for the missions analyzed. We are not claiming this amount as funds put to better use.

## Operations Could Be Improved

### Data May Not Be Adequate for Analysis and Decision Making

The ICE Air charter flight data captured is incomplete and inaccurate, and may not be sufficient for analysis and decision making. According to ICE Air records, it transported 930,435 detainees over a 3-1/2-year period. Of this amount, the program removed 711,945 detainees to their country of origin. It transferred the remaining 218,490 detainees among ICE field offices for various reasons, including lack of bed space, immigration proceedings, medical needs, security concerns, and other administrative reasons.

ICE Air records data pertaining to charter flights and detainees in the Alien Repatriation Tracking System (ARTS). A contractor who managed the program's daily activities created the ARTS database to provide a historical record of charter flights, monthly statistical reports, and data responses to ICE required under the contract. ARTS captures information such as the dates, routes, detainees, delays or cancelations, and costs associated with each chartered flight mission. A mission begins when the aircraft departs from its initial location and ends when the aircraft reaches its final destination.[1] Depending on the need, a mission can contain one or more stops to destinations within the United States, internationally, or a combination.

An analysis of 7,445 missions and associated detainees identified errors and missing information in various fields. For example:

[1] The definition for the term "mission" is derived from the definition used in the former Office of Detention and Removal Operations' *Policy and Procedure Manual* (June 2008).

- There were 23,597 detainees listed as being "picked up" or "dropped off" at locations not on the charter flight route. Specifically, there were 54 detainees recorded as removed to Nicaragua for one mission that included stops only in Louisiana, Texas, and Guatemala.

- Information such as gender, criminal status, or known gang affiliation was incomplete or in error;

  - The data field "Sex," used to record gender, is not restricted to male or female, and contains numerous entries, such as the numbers 0, 30, and the word "none."

  - The data field "Criminality" was not restricted to specific entry choices and contains non-logical entries such as "#Ref!". The field is blank for 20,798 detainees.

  - The data field "Gang Member" contains non-logical numerical entries, such as "2" or "3770701," for at least 3,000 detainees. The field is blank for 155,966 detainees.

- The "Status" field is not restricted to specific entry choices. It contains 894 different entries and is blank for 31,209 detainees. This field provides information regarding the purpose for a detainee's transport, such as bond hearing, consular interview, and medical transfer.

- The data fields in ARTS for the alien number and the fingerprint identification number are also not restricted to defined entries and contain errors;

  - The alien file number is a unique seven-, eight- or nine-digit number. However, the field entries range from 1 to 32 characters in length. Alien file numbers were not recorded for 2,575 transported detainees.

  - ICE takes fingerprints for all detainees, yet ARTS did not contain an identification number for fingerprints belonging to 190,243 transported detainees.

ERO management did not develop a data management plan that could help ensure that employees accurately record all mission data in a standardized format. The lack of reliable data limits the ability of management to make informed decisions regarding how many planes it needs to transport the current level of detainees, whether it should revise the frequency of its flights, and how to improve operations overall. Government and private sector best

practices describe a data management plan as a key element in ensuring accurate and reliable information. According to *Department of Defense Guidelines on Data Quality Management*, a data management plan should contain the processes for:

- defining data quality requirements and establishing data quality metrics;
- measuring data quality conformance;
- verifying, validating, and assessing the causes for poor quality data; and
- identifying and implementing data quality improvements.

**Program Staffing, Training, and Guidance Needed**

ICE Air's charter operations do not have sufficient trained personnel, and current employees lack the proper guidance to ensure successful daily operations. In May 2014, ICE Air transitioned program management from contract to government personnel without adequate planning. These processes included scheduling flights, obtaining country clearances, manifesting detainees,[2] tracking charter contract costs, and reviewing invoices. ICE Air replaced the contractors with full-time employees. ICE Air staff said the program office did not adequately assess staffing and training needs to ensure continuity and effective daily operations. During the transition, ERO designated one person to identify the positions held by contractors and to determine how many Federal employees it needed to perform the same tasks. This individual determined that ICE Air needed 19 employees to replace the 37 contractors who had previously provided mission support functions; however, only 13 Federal employees were present when the contractor departed.

ERO has not established comprehensive policies and procedures as guidance for the ICE Air program. Staff responsible for arranging the charter flights explained the informal processes used to schedule, manifest, and oversee the charter flight operations. The schedulers do not have formal policies and procedures on how to prioritize charter flights or detainees. Management is responsible for establishing and maintaining policies and procedures sufficient to ensure that they efficiently operate Federal programs and use Federal resources to achieve desired objectives.

The flights operate out of four main U.S. cities: Mesa, AZ; San Antonio, TX; Alexandria, LA; and Miami, FL. Charter flights can go to international locations

[2] Manifesting detainees is listing all the detainees who will board a flight. The Federal Aviation Agency requires all flights to maintain a complete manifest prior to each flight.

and any of the 24 field offices. Figure 3 illustrates examples of different domestic missions used by ICE Air.




**Figure 3: ICE Air Weekly Domestic Routes**

*Source:* ICE Air Operations.

**AIRPORT LEGEND**

| | | | |
|---|---|---|---|
| **AEX** | **Alexandria, LA** | MCI | Kansas City, MO |
| ATL | Atlanta, GA | MDT | Harrisburg, PA |
| BFI | Seattle, WA | **MIA** | **Miami, FL** |
| BFL | Bakersfield, CA | MSP | Minneapolis, MN |
| BOI | Boise, ID | NYL | Yuma, AZ |
| CSG | Columbus, GA | OAK | Oakland, CA |
| DEN | Denver, CO | OMA | Omaha, NE |
| ELP | El Paso, TX | ORD | Chicago, IL |
| EWR | Newark, NJ | RNO | Reno, NV |
| HOU | Houston, TX | SAN | San Diego, CA |
| HRL | Harlingen, TX | **SAT** | **San Antonio, TX** |
| **IWA** | **Mesa, AZ** | SLC | Salt Lake City, UT |
| LAS | Las Vegas, NV | TOL | Toledo, OH |
| LRD | Laredo, TX | | |

The schedulers worked from a few existing regular routes and added or removed stops to arrange more than 600 different routes to transport detainees to their final destination. To arrange the routes, the schedulers make subjective decisions and modifications based on conversations with field office personnel. The schedulers also coordinate with field offices regarding the number of detainees ready for removal and the number of seats available on a particular flight. ICE Air staff said they could benefit from more guidance, such as a formula or criteria based on analysis of historical data when prioritizing routes and detainees. Figure 4 illustrates examples of different international missions used by ICE Air to remove detainees.




**Figure 4: ICE Air Routine International Routes**

*Source:* ICE Air Operations.

**<u>AIRPORT LEGEND</u>**
IWA Mesa, AZ
SAT San Antonio, TX
AEX Alexandria, LA
MIA Miami, FL

Based on conversations with management, we determined ICE Air provided newly hired staff with some initial training. However, several employees said they did not receive adequate training to perform assigned tasks effectively. For example:

¾ Schedulers received a week of on-the-job training. However, an ICE Air management official said the training was insufficient and did not address the complexities of scheduling.

¾ An employee hired for mission support functions generated reports and provided statistical data for public inquiries. The employee had no prior experience as a data analyst or information technology specialist who could generate reports, alter entry fields, or create new databases as needed. Although ICE Air provided some initial training, the employee said it was inadequate to enable the employee to perform the duties effectively.

¾ Four additional employees in various positions also said they had not received adequate training to perform their duties effectively.

**Missed Opportunities to Improve Efficiency**

ICE Air spent approximately $116 million for flights from October 2010 through March 2014 that did not fill every allowable seat and flew at less than 80 percent of the aircraft's capacity. Although ERO conducted some studies to reduce costs, ERO management does not have a mechanism in place to obtain feedback on how well its processes are performing. As a result, ERO management may have missed opportunities to identify information that can improve the program's overall effectiveness. This includes flight capacity levels and detention costs; reasons detainees are removed from the manifest; reasons for redundant transfers; and time and cost for each mission stop.

Many factors affect ICE Air's ability to provide efficient air transportation services. For example:

x ICE Air must respond to special requests by the DHS Secretary and other mission needs such as the recent surge of unaccompanied children.

x ICE Air must comply with various restrictions imposed by different countries when transporting detainees for removal. Restrictions include the number, timing, and frequency of flights a country will accept.

x ICE Air does not control the number of detainees each country will accept. For instance, Guatemala and Honduras permit 135 detainees on each removal flight; yet, El Salvador will only accept 120 detainees on each flight.

x Some countries accept juveniles on charter flights; in contrast, other countries do not.

x ICE Air also depends on ERO field offices to properly manifest, verify medical screening, and prepare detainees for transport.

ERO conducted several studies between February 2012 and December 2013 to identify areas for potential cost savings and efficiencies. As a result, ICE Air reduced the frequency of one of its domestic transfer routes. ICE Air has also begun to address its reporting needs to respond better to questions about the air transportation related to the surge of illegal immigrants in the Rio Grande Valley in 2014. However, in spite of these efforts, ICE Air missed opportunities to improve efficiencies with its air transportation and to address the quality of its mission data.

An analysis of the number of detainees transported for 5,699 of the 7,445 missions we reviewed revealed that ICE Air was not operating at full capacity for both its domestic and international missions. ICE Air does not know its optimum capacity levels for each type of mission, such as its domestic transfers, direct routes to international countries, and non-direct routes to both domestic and international destinations. Therefore, the program may have been able to transport the same number of detainees with fewer missions at a lower charter air cost. Of the 5,699 missions analyzed, approximately 2,121 missions (or 37 percent) operated under 80 percent capacity, but we do not know whether this performance level is good or bad. ICE Air needs to ensure the data is complete and accurate for analysis to determine its optimum capacity levels and make sound business decisions.

Table 1 provides a summary of the results of our review. Although tests of the reliability of the data revealed errors in some fields, we reconciled the number of missions, the costs reported with the financial records, and ICE's reported statistics (see appendix E for detailed results).

**Table 1. Analysis of Seat Capacity**

| Percent of Allowable Seats Used | Missions | Detainees Transported | Mission Cost |
|---|---|---|---|
| less than 40% | 299 | 9,759 | $ 11,983,026 |
| 40% – 60% | 754 | 52,226 | $ 41,085,000 |
| 61% – 79% | 1,068 | 100,982 | $ 62,496,952 |
| 80% or more | 3,578 | 505,175 | $ 211,841,666 |
| **Total** | **5,699** | **668,142** | **$ 327,406,644** |

**ICE Air spent approximately $116 million on flights less than 80% capacity**

*Source:* OIG analysis of ICE Air mission data recorded in ARTS.

*Flight Capacity*

ICE Air needs to determine its optimum seat capacity level for each mission type and the reasons why flights operate at less than full capacity. Even when ICE was limited to 120 seats because of country restrictions, ICE Air only used 90 seats at times; leaving the remaining seats empty, which may not be efficient.

Each time a scheduled detainee does not board a flight, the flight operates less efficiently. ICE Air management provided several reasons for empty seats. For example, ICE Air may remove detainees scheduled to travel from the manifest because of fear of returning to their country, missing travel documents, and medical reasons. However, 69 percent of all detainees scheduled to be on the flights who did not show up for travel were recorded as "no show" or the field was left blank. Without documenting the reason the detainee missed the flight, ICE Air does not have the information to correct potential problems in the process.

*Redundancy when Transporting Detainees*

A limited analysis of detainees transferred multiple times identified six detainees with redundant transfers that may not have been necessary. ICE Air moved all six detainees multiple times between the same cities. It was not possible to determine whether the transfers were necessary based on the ARTS information available. ERO does not collect and analyze data related to redundant transfers to determine the frequency, causes, or possible solutions. ICE Air officials said that detainees transfer back to the field office if travel documents are missing or for detainee medical reasons. Chart 1 illustrates the questionable transfers:

**Chart 1: Questionable Detainee Transfers**




*Source*: OIG Analysis of ICE data.

*Tracking Time and Cost for Each Mission Stop*

ICE Air needs to identify and track the time and cost for each mission stop. Each charter mission may involve as many as nine stops, and each route varies in distance and travel time. ICE Air only captures information regarding the cost and flight hours for the overall mission rather than for each stop. Therefore, if ERO wants to improve a mission's efficiency by changing a stop location or removing a stop from a route, it does not have sufficient data to assess the impact associated with an individual stop.

ICE Air may have missed opportunities to improve its operations. Based on our analysis of flight capacity in appendix F, ICE Air may have been able to save up to $41.1 million to transport detainees had it operated each flight at full capacity. Although we realize that operating at full capacity is not always possible and may result in additional cost, the potential cost savings illustrates the need for better planning, management, and reporting.

## Conclusion

Although ICE Air met its mission by transporting 930,435 detainees over a 3-1/2-year period, it may have been able to use its resources more effectively. ICE Air does not capture complete and accurate data essential to support operational decisions and does not have a mechanism in place to obtain feedback on how well its processes are performing.

These shortfalls occurred because ERO did not develop a data management plan, assess its staffing and training needs, and implement formal guidance to support successful daily operations. As a result, ERO management may have missed opportunities to improve the program's overall effectiveness. In addition, ICE Air operated charter flights with empty allowable seats and could realize cost savings of up to $41.1 million once it determines optimum flight capacity.

## Recommendations

**Recommendation 1:** We recommend that the Executive Associate Director for Enforcement and Removal Operations provide formal policies and procedures for the ICE Air Operations program to ensure that it operates efficiently and that resources are used effectively to achieve the desired objectives. These procedures should address, at a minimum:

a. clearly defined roles and responsibilities,
b. performance measures, and
c. reporting standards.

**Recommendation 2:** We recommend that the Executive Associate Director for Enforcement and Removal Operations assess and provide the staffing and training needed to ensure effective air transportation of detainees.

**Recommendation 3:** We recommend that the Executive Associate Director for Enforcement and Removal Operations develop and implement a Data Management Plan to ensure ICE Air Operation's data is accurate, complete, and reliable to support analysis and decision-making.

**Recommendation 4:** We recommend that the Executive Associate Director for Enforcement and Removal Operations conduct a comprehensive assessment of the Transportation and Removal Program to identify factors that affect detainee air transportation's efficiency, such as capacity levels; reasons detainees are removed from the manifest; reasons for redundant transfers; and time and cost for each mission stop. It should also develop a plan to prioritize and address the critical factors annually to demonstrate ICE Air Operations is using its resources effectively.

## ICE's Comments to the Draft Report

ICE provided comments on the draft of this report. A copy of the response, in its entirety, is included in appendix C. ICE disagreed with the use of empty seats as a measure of efficiency, citing that delaying the removal of individuals to fill empty seats may incur higher costs, and that there are factors that are more important than seat cost. As noted in our report, we agree that an analysis of the data needs to occur for ICE to know what is most efficient when transporting detainees. The analysis of empty seats is only one method ICE may consider to help identify factors that may improve efficiency. ICE also provided technical comments and suggested revisions to our report in a separate document. We reviewed ICE's technical comments and made changes throughout our report where appropriate.

## OIG Analysis of ICE's Comments

### Management Comments to Recommendation #1

**Concur.** ICE ERO indicated it is working on formal policies and procedures to ensure that resources are effectively used to achieve the desired objectives. ICE expects to complete and issue the documents by December 31, 2015.

**OIG Analysis**
We consider ICE's ongoing actions responsive to the recommendation. This recommendation is considered open and resolved until ICE ERO provides documentation that the planned corrective actions are completed and implemented.

**Management Comments to Recommendation #2**
**Concur.** ICE ERO stated that since the audit was conducted, ICE Air hired 58 employees out of 62 authorized positions. In addition, ICE Air is training Enforcement and Removal Assistants and Flight Schedulers on the new processes of scheduling flights, tracking flights, and performing quality checks on the scheduling process. All activities should be completed by July 31, 2016.

**OIG Analysis**
We consider ICE's actions responsive to the recommendation. This recommendation is considered open and resolved until ICE ERO provides documentation that the planned corrective actions are completed.

**Management Comments to Recommendation #3**
**Concur.** ICE ERO stated it is developing a Data Management Plan that will ensure that ICE Air's data is accurate, complete, and reliable to support analysis and decision making. In addition, ICE Air is working with the ERO Law Enforcement and Systems Analysis Division, as well as the field offices, to focus on data integrity, and better track the reasons scheduled passengers do not board flights. ICE Air is also working to collect, clean up, store, and reconcile flight mission data. ICE expects to complete all corrective actions by November 30, 2016.

**OIG Analysis**
We consider ICE's ongoing actions responsive to the recommendation. This recommendation is considered open and resolved until ICE ERO provides documentation that the planned corrective actions are completed.

**Management Comments to Recommendation #4**
**Concur.** ICE ERO stated it plans to complete a comprehensive assessment of the Transportation and Removal Program to identify factors that affect detainee air transportation's efficiency. The assessment also depends upon the successful completion and implementation of the Data Management Plan discussed in recommendation 3. ICE provided a completion date of March 31, 2017.

**OIG Analysis**
We consider ICE's ongoing actions responsive to the recommendation. This recommendation is considered open and resolved until ICE ERO provides documentation that the planned corrective actions are completed.

# Appendix A
# Transmittal to Action Official

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

APR 9 2015

MEMORANDUM FOR: Thomas Homan
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

FROM: Mark Bell
Assistant Inspector General for Audits

SUBJECT: *ICE Air Transportation of Detainees Could Be More Effective*

Attached for your action is our final report, *ICE Air Transportation of Detainees Could Be More Effective.* The report identifies measures the U.S. Immigration and Custom Enforcement can take to improve the Air Operation program's overall effectiveness.

The report contains four recommendations aimed at improving the effectiveness of the program. Your office concurred with all of the recommendations. Based on information provided in your response to the draft report, we consider all of the recommendations open and resolved. Once your office has fully implemented the recommendations, please submit a formal closeout letter to us within 30 days so that we may close the recommendations. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions and of the disposition of any monetary amounts. Please send your response or closure request to OIGAuditsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to appropriate congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Paul Wood, Acting Deputy Assistant Inspector General for Audits, at (202)254-4100.

Attachment

# Appendix B
# Objective, Scope, and Methodology

The DHS OIG was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibilities to promote economy, efficiency, and effectiveness within the Department.

We conducted this audit to determine whether ERO's processes for the air transfer and removal of detainees ensure the most effective use of resources. The scope consisted of a review of air transportation of detainees during fiscal year (FY) 2011 through second quarter FY 2014. We reviewed the internal controls for ICE Air as it relates to charter operations.

To accomplish our objective we conducted site visits to ICE Headquarters in Washington DC; ICE Air Headquarters in Mesa, AZ; and ICE field offices in Phoenix and Florence, AZ; Miami, FL; and Houston, TX. We obtained and reviewed pertinent Federal, departmental, and ICE specific regulations, policies, procedures, and guidance relevant to the Air Operations program. At each location, we interviewed ICE officials and staff responsible for the management, oversight, and execution of the ICE Air Operations program for detainees. In Mesa, we observed the detention, staging, and aircraft boarding operations for ICE Air charter flights.

In addition, we conducted data analysis of the ARTS, used to document ICE Air charter missions. To determine the accuracy and completeness of recorded data, we analyzed the data fields and entries used to record transported detainees for anomalies, errors, and omissions. We found numerous errors and omissions regarding the gender, criminality, status, gang affiliation, and recorded pick-up and drop-off locations of individual detainees; rendering much of the detainee data unreliable for further analysis, as discussed in the body of our report.

Despite these limitations, we determined that the recorded mission date, flight hours, number of detainees, mission cost, and mission routes were sufficiently accurate and complete to allow for an analysis of the capacity of chartered missions pertinent to our audit objective. We selected a random sample of 32 missions and verified data recorded in the ARTS database to the detainee manifests and vendor invoices for each of the sampled missions. We also compared the total cost recorded in the ARTS database to the amounts

reported in ICE's financial reporting system. We compared the number of detainees reported as removed in the ARTS database to the number of detainees reported as removed in an ICE Air charters briefing document.

We determined that the ARTS database contained 7,951 missions to transport 930,435 detainees at a total cost of about $456 million for the period October 1, 2010, to March 31, 2014. Of these missions, 7,445 used a 136-passenger aircraft to transport 857,421 detainees at a total recorded cost of $448 million for the scope period. The remaining 506 missions were either canceled, for long-range international charters, or other missions flown using smaller aircraft.

To determine the efficiency of the 7,445 charter missions:

- We selected all 4,136 domestic missions and a judgmental sample of 1,563 international missions for analysis. The selected missions transported 668,142 detainees at a total recorded cost of $327.4 million.

- The 4,136 domestic missions analyzed transported 491,084 detainees at a total cost of $231.3 million.

- The 1,563 international missions sampled transported 177,058 detainees at a recorded total cost of $96.1 million.

- We analyzed the selected missions to determine the percentage of available seats used.

See appendix E for the results of our analysis.

We conducted this performance audit between May and November 2014 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions.

OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# Appendix C
# Immigration and Customs Enforcement Comments to the Draft Report

*Office of Management and Administration*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration and Customs Enforcement

March 17, 2015

MEMORANDUM FOR: Mark Bell
Assistant Inspector General for Audits
Office of Inspector General

FROM: Radha C. Sekar
Executive Associate Director
Management and Administration

SUBJECT: Management Response for OIG Draft Report, "ICE Air Transportation of Detainees Could Be More Effective" dated February 9, 2015 (OIG Project No. 14-093-AUD-ICE)

Thank you for the opportunity to review and comment on the subject draft report. U.S. Immigration and Customs Enforcement (ICE) appreciates the Office of Inspector General's (OIG) work in planning and conducting its review and issuing this report on the effectiveness of detainee transportation.

ICE is pleased to note the OIG's recognition that ICE's Office of Enforcement and Removal Operations' (ERO) air transfer program was meeting its mission of transporting detainees and had found ways to reduce costs.

ICE, as its actions have shown, remains fully committed to improving the efficiency of its removal operations. Even prior to this audit, ICE was able to save over $27 million by switching from the Justice Prisoner and Alien Transportation System (JPATS) to ICE Air Operations (ICE Air) in October 2011. ICE leadership had already identified many of the points raised in the OIG's recommendations as issues of interest, and had begun addressing them prior to OIG commencing its review.

It is important to note that when the OIG conducted their fieldwork from March through November 2014, ICE Air was in the middle of a major consolidation and transition. During the past eight months, ICE Air has made great strides, addressing a myriad of staffing, training, data integrity, management, and systems modernization efforts in response to the anticipated final report.

However, we do disagree with one element in the report - the use of empty seats as an index of efficiency. The use of empty seats on charter flights is not a practical measure

www.ice.gov

of efficiency for two reasons. First, delaying the removal of individuals in order to fill empty seats incurs costs that may exceed the cost of empty seats. Second, there are several factors that may be more important than seat cost that prevent ICE from filling 100 percent of charter flight seats.

As the report strongly argues, the use of ICE Air should be a data-driven decision. ICE believes that both detention and removal costs, as well as current operational priorities, must be considered in the equation on the scheduling of ICE Air missions. As of December 31, 2014, the average detention bed rate is approximately $122 per day. It makes no fiscal sense to delay a large group of detainees to fill a small number of vacant seats.

Just as commercial pilots must reduce the number of passengers based on environmental conditions at takeoff for some aircraft, ICE Air must reduce the number of passengers it brings on certain charter flights based on the rules of some countries. Also, if a person becomes ill and is unable to fly, and no alternative is available, the cost of one seat may not be worth the expense of waiting for an alternate to fill the seat. Seat capacity and associated justifications for not flying full are dependent on a number of factors which include, but are not limited to, operational priorities; available detention space and associated detention costs; allowable numbers to be manifested for a specific country; and, what makes sense for a particular mission.

The draft report contained four recommendations with which ICE concurs. Specifically, OIG recommended that ICE's Executive Associate Director for Enforcement and Removal Operations:

**Recommendation 1**: Provide formal policies and procedures for ICE Air Operations (ICE Air) to ensure that it operates efficiently and that resources are effectively used to achieve the desired objectives. At a minimum, these procedures should address the following: (a) clearly defined roles and responsibilities, (b) performance measures, and (c) reporting standards.

**Response:** Concur. ICE ERO is working on formal policies and procedures for ICE Air to ensure that it operates efficiently and that resources are effectively used to achieve the desired objectives. In addition, various standard operating procedures (SOPs) for flight schedulers and data management staff have already been promulgated and are currently in use.

We request that this recommendation be considered resolved and open pending completion of the aforementioned activities. Estimated Completion Date (ECD): December 31, 2015.

**Recommendation 2:** Assess and provide the staffing and training needed to ensure the effective air transportation of detainees.

**Response:** Concur. Since the audit was conducted, ICE Air has hired a full complement of staff of 58 personnel (out of a total of 62 authorized positions, resulting in a staffing

level of nearly 94 percent). ICE has completed the consolidation and transition of its workforce from Kansas City, MO to Mesa, AZ. Contractors have been replaced by Government personnel, who have been trained in the new processes. ICE Air employees (Enforcement and Removal Assistants / Flight Schedulers) are being trained on the new processes of scheduling flights, tracking flights, and performing quality checks on the scheduling process through On the Job Training and written SOPs. Ongoing training will occur for all new employees to ensure the effective air transportation of detainees.

We request that this recommendation be considered resolved and open pending completion of the aforementioned activities. ECD: July 31, 2016.

**Recommendation 3:** Develop and implement a Data Management Plan to ensure that IAO's data is accurate, complete, and reliable to support analysis and decision-making.

**Response:** Concur. ICE ERO is developing and implementing a Data Management Plan to ensure that IAO's data is accurate, complete, and reliable to support analysis and decision-making. ICE Air is working with the ERO Law Enforcement and Systems Analysis Division (LESA), as well as the field offices, to continue to focus on data integrity, and better track the reasons for which scheduled passengers fail to show at the flight line or are rejected at the flight line for lack of sufficient documentation. ICE Air and LESA have implemented a plan to collect charter flight mission data, clean up the data provided by field offices, store data, and reconcile data across data bases. Also, the programs are working closely with Headquarters to address statistical reporting requirements, with a priority on metrics and performance measures.

The Data Management Plan is currently being drafted with extensive input from data management subject matter experts, ICE Air operational staff as well as senior leadership, and is expected to be finalized, implemented and adjusted, as needed, to ensure accurate, complete and reliable data. These efforts are ongoing and considered to be a high priority long-term project for ICE Air.

We request that this recommendation be considered resolved and open pending completion of the aforementioned activities. ECD: November 30, 2016.

**Recommendation 4:** Conduct a comprehensive assessment of the Transportation and Removal Program to identify factors that affect detainee air transportation's efficiency, such as: capacity levels; reasons detainees are removed from the manifest; reasons for redundant transfers; and time and cost for each mission stop. It should also develop a plan to prioritize and to address the critical factors annually to demonstrate that IAO is using its resources effectively.

**Response:** Concur. ICE ERO is working on conducting a comprehensive assessment of the Transportation and Removal Program to identify factors that affect detainee air transportation's efficiency. The assessment is concurrent with and reliant upon the successful completion and implementation of the Data Management Plan discussed in recommendation 3. Also, ICE is working closely with Headquarters to address statistical reporting requirements, with a priority on metrics and performance measures.

3

We request that this recommendation be considered resolved and open pending completion of the aforementioned activities. ECD: March 31, 2017.

Again, thank you for the opportunity to review and comment on this draft report. Technical comments were previously provided under separate cover. Should you have any questions, please contact Michael Moy, Senior Portfolio Manager, at (202) 732-6263 or by email at Michael.C.Moy@ice.dhs.gov. We look forward to working with you in the future.

4

# Appendix D
# ICE Air Operational Costs

| | **2011** | **2012** | **2013** | | **Total** |
|---|---|---|---|---|---|
| **Charter** | $124,660,618 | $125,610,645 | $125,901,869 | $87,925,214 | **$464,098,346*** |
| **Commercial** | 33,677,042 | 33,074,231 | 30,980,147 | 11,803,201 | **109,534,621** |
| **Payroll & Benefits** | 4,508,993 | 5,576,596 | 6,134,360 | 3,385,406 | **19,605,355** |
| | 314,905 | 99,296 | 2,633,111 | 1,946,909 | **4,994,221** |
| **Total** | **$163,161,558** | **$164,360,768** | **$165,649,487** | **$105,060,730** | **$598,232,543** |

*Source:* OIG tabulation of ICE's financial data. We did not validate this data.
*Total charter costs may include travel expenses for employees as well as detainees.

# Appendix E
# Analysis of Charter Missions

An analysis of 5,699 domestic and international missions selected for the scope period, October 1, 2010, through March 31, 2014, revealed that missions operated under capacity.

Domestic missions account for 52 percent of all charter flights. The analysis included all the domestic missions.

## Domestic Missions

| Percent of Allowable Seats Used | Missions | Detainees Transported | Mission Cost |
|---|---|---|---|
| **< 40%** | 276 | 9,205 | $11,051,460 |
| **40% – 60%** | 638 | 44,280 | $33,794,267 |
| **61% – 79%** | 778 | 73,860 | $43,940,621 |
| **>80%** | 2,444 | 363,739 | $142,525,371 |
| **Total** | **4,136** | **491,084** | **$231,311,719** |

For international missions, ICE Air flew most to Guatemala, Honduras, and El Salvador. The analysis reviewed 1,563 missions that represented about 47 percent of all international missions, at a recorded cost of $96 million. The sample of international missions includes all direct mission routes to these three countries. Direct missions begin at a U.S. city, depart to one international country, and return to the United States.

## Direct International Missions to Guatemala, Honduras, and El Salvador

| Percent of Allowable Seats Used | Missions | Detainees Removed | Mission Cost |
|---|---|---|---|
| **< 40%** | 21 | 474 | $799,376 |
| **40% – 60%** | 86 | 5,818 | $5,423,042 |
| **61% – 79%** | 179 | 16,711 | $11,559,653 |
| **> 80%** | 618 | 76,436 | $36,660,908 |
| **Total** | **904** | **99,439** | **$54,442,979** |

The sample of international missions also included 659 non-direct missions representing the top 4 routes to each of these countries. A non-direct mission contains stops at domestic cities and one or more international countries.

**Non-Direct International Missions to Guatemala, Honduras, and El Salvador**

| Percent of Allowable Seats Used | Missions | Detainees Removed | Mission Cost |
|---|---|---|---|
| **< 40%** | 2 | 80 | $132,190 |
| **40% – 60%** | 30 | 2,128 | $1,867,690 |
| **61% – 79%** | 111 | 10,411 | $6,996,679 |
| **> 80%** | 516 | 65,000 | $32,655,387 |
| **Total** | **659** | **77,619** | **$41,651,946** |

# Appendix F
# Potential Cost Savings

To calculate ICE Air's potential for cost savings, we determined the maximum amount of potential cost savings ICE Air could have achieved if the flights had operated at full capacity and all other factors remained constant. This estimate is based on the average of charter costs incurred during the scope period for the missions analyzed. This calculation is an indicator of ICE Air's potential for future cost savings, actual expenses would include additional costs such as, detention costs and medical care. Such expenses cannot be projected and may reduce the amount of ICE Air's future cost savings. We understand ICE Air cannot always use all allowable seats on every flight, but we believe ICE Air can improve the efficiency of its operations.

Table 2 illustrates the number of detainees transported for the missions reviewed by country, divided by the number of available seats for the respective countries. Each country determines the maximum number of detainees it is willing to receive per flight. ICE Air cannot control this number, and it can sometimes vary.

**Table 2. Estimated Number of Flights Needed FY 2011 – 2nd QTR FY 2014**

| Country | Detainees Transported | Maximum Detainees per Flight | Estimated Flights Needed |
|---|---|---|---|
| | (C ) | (D) | (C)/(D) = (F) |
| **Guatemala (Direct)** | 55,794 | 135 | 414 |
| **Honduras (Direct)** | 27,719 | 135 | 206 |
| **El Salvador (Direct)** | 15,926 | 120 | 133 |
| **Guatemala (Non-Direct)** | 35,006 | 135 | 260 |
| **Honduras (Non-Direct)** | 24,871 | 135 | 185 |
| **El Salvador (Non-Direct)** | 17,742 | 120 | 148 |
| **Domestic** | 491,084 | 135 | 3,638 |

Next the average cost per mission was determined. See table 3.

| **Table 3. Average Cost per Mission** | | | |
|---|---|---|---|
| **Country** | **Missions** | **Mission Costs** | **Average Cost per Mission** |
| | **(A)** | **(B)** | **(B)/(A) = (E )** |
| **Guatemala (Direct)** | 478 | $29,063,131 | $60,802 |
| **Honduras (Direct)** | 261 | $14,878,081 | $57,004 |
| **El Salvador (Direct)** | 165 | $10,501,767 | $63,647 |
| **Guatemala (Non-Direct)** | 286 | $17,442,787 | $60,989 |
| **Honduras (Non-Direct)** | 205 | $12,084,712 | $58,950 |
| **El Salvador (Non-Direct)** | 168 | $12,124,447 | $72,169 |
| **Domestic** | 4136 | $231,311,719 | $55,926 |

Last, the average cost per mission is multiplied by the number of flights needed to determine the estimated cost for flights operated at full capacity. ICE Air's mission costs less the estimated costs of flights at full capacity yield the estimated potential cost savings. This estimate is based on the average of costs ICE Air incurred during the scope period. Actual costs, including additional costs for detainee detention can not be projected and may reduce the amount of savings (see table 4). We are not claiming this figure as a funds put to better use.

| **Table 4. Estimated Potential Cost Savings** | | | |
|---|---|---|---|
| **Country** | **Mission Costs** | **Estimated Cost of Flights at Full Capacity** | **Estimated Potential Cost Savings** |
| | **(B)** | **(F)*( E) = (G)** | **(B) - (G)** |
| **Guatemala (Direct)** | $29,063,131 | $25,172,028 | $3,891,103 |
| **Honduras (Direct)** | $14,878,081 | $11,742,824 | $3,135,257 |
| **El Salvador (Direct)** | $10,501,767 | $8,465,051 | $2,036,716 |
| **Guatemala (Non-Direct)** | $17,442,787 | $15,857,140 | $1,585,647 |
| **Honduras (Non-Direct)** | $12,084,712 | $10,905,750 | $1,178,962 |
| **El Salvador (Non-Direct)** | $12,124,447 | $10,681,012 | $1,443,435 |
| **Domestic** | $231,311,719 | $203,458,788 | $27,852,931 |
| | | **Total Potential Cost Savings** | **$41,124,051** |

*Source:* DHS OIG Analysis of ICE Alien Removal Transportation System Mission Data.

# Appendix G
# Office of Audits Major Contributors to This Report

Patrick O'Malley, Director
Yesenia Starinsky, Audit Manager
Philip Emswiler, Program Analyst
Carolyn Floyd, Auditor
Enrique Leal, Auditor
Eliece Pizarro, Auditor
Kevin Dolloson, Communications Analyst
Gary Alvino, Independent Report Referencer

# Appendix H
# Report Distribution

## Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy Chief of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Assistant Secretary for Office of Policy
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
ICE Acting Director
ICE Audit Liaison

## Office of Management and Budget

Chief, Homeland Security Branch
DHS OIG Budget Examiner

## Congress

Congressional Oversight and Appropriations Committees

ADDITIONAL INFORMATION AND COPIES

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov. Follow us on Twitter at: @dhsoig.

OIG HOTLINE

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

Internal Revenue Service
Appeals Office
55 North Robinson Avenue
STOP 8000 OKC
Oklahoma City, OK 73102

Department of the Treasury

**Person to Contact:**
David A Parsons
Employee ID Number: 1000668394
Tel: 405-297-4909
Fax: 405-297-4967
**Refer Reply to:**
AP:AO:OKL:DAP
**In Re:**
Excise Taxes
**SSN/EIN Number:**
Redacted
**Tax Period(s) Ended:** 200912, 201003, 201006, 201009, 201012, 201103, 201106, 201109, 201112

Date: June 27, 2013

CSI Aviation Services, Inc
3700 Rio Grande Blvd NW Ste 1
Albuquerque, NM 87107

CSI Aviation Services, inc:

The agreement you reached with Appeals Team Case Leader James R. Conner resulted in your case being closed from Appeals as a no-change on November 5, 2012. Please note that we have completed our processing of your case. Since there was no deficiency or overassessment, you do not need to take any further action.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely,

David A. Parsons
Appeals Team Manager

cc:
John Heer
Laflin, Pick & Heer
P.O. Box 3260
Albuquerque, NM 87190